## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| BRAD LINTON, Derivatively on Behalf of Nominal Defendant PARETEUM CORPORATION, | |
| Plaintiff, | |
| v. | C.A. No. |
| ROBERT H. TURNER, EDWARD O'DONNELL, DENIS MCCARTHY, LAURA THOMAS, VICTOR BOZZO, LUIS JIMENEZ-TUÑON, ROBERT LIPPERT, and YVES VAN SANTE, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| PARETEUM CORPORATION, | |
| Nominal Defendant. | |

## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Brad Linton ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Pareteum Corporation ("Pareteum" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, gross mismanagement, and violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Pareteum with the U.S. Securities and Exchange Commission ("SEC"), press releases,

1

news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.        NATURE AND SUMMARY OF THE ACTION

1.        Pareteum provides global cloud communications services, including voice, video, text messaging, and data services to its customers, which include early stage businesses, software developers, and communications service providers.

2.        Until November 2015, the Company was known as Elephant Talk Communications Corp., a declining penny stock company with few positive business prospects.  After implementing a series of changes, including rebranding as Pareteum and appointing Robert H. Turner as Executive Chairman and Victor Bozzo as Chief Executive Officer, the Company's market capitalization expanded significantly, from less than $20 million during December 2016, to as high as $569 million during May 2019.

3.        Pareteum approximates its growth potential using 36-month contractual revenue backlog, which is revenue purportedly owed to the Company through its contracts with customers. For the fiscal year ended December 31, 2018, the Company's backlog totaled $615 million, representing a more than 300% increase over the prior year. This dramatic increase in backlog signaled that the Company would soon experience significant growth.

4.        From 2017 to mid-2019, the Company touted its rising backlog and conversion of its backlog to revenue, in addition to its involvement in new technology such as blockchain and its purportedly lucrative contracts with new customers, as indications of its success.

5.        In reality, many of the customers who purportedly contributed to the Company's backlog during this period were either greatly exaggerated or even nonexistent; these purported customers had little to no capital or meaningful business activity, or were outright closed or dissolved.  As such, Pareteum was unlikely to collect any revenue from these customers.

6.      The truth began to emerge in a series of investigative reports. On June 7, 2019, Marcus Aurelius Value published a report entitled, "TEUM: Where Are The Customers?" (the "Marcus Aurelius Report"), highlighting suspicious customer transactions that comprised the Company's abnormally large backlog.[1]  For example, investigators visited the headquarters for one of Pareteum's customers and found "only a dilapidated shack and crumbling structures near a rural African village."  The report also documented ties between certain of the Company's officers and various failed stock fraud schemes, as well as connections to entities associated with Barry Honig, a known stock manipulator and the subject of SEC and Department of Justice investigations.

7.      On this news, the Company's shares fell $0.83 per share, or over 24%, to close at $2.58 per share on June 7, 2019, on unusually heavy trading volume.  The Company adamantly denied the report and cast it as a "coordinated attack by short sellers."

8.      Later the same month, on June 25, 2019, Viceroy Research Group published a report entitled, "Pareteum – the Wild West of Telecoms" (the "Viceroy Report"),[2] alleging certain accounting discrepancies in the Company's financial statements stemming from the Company's inflated backlog.

9.      On this news, the Company's share price fell $0.51, or over 20%, to close at $2.00 per share on June 26, 2019, on unusually heavy trading volume.  Still, the Company dismissed the reports as "spurious claims."

10.     Despite the denials, the Company's stock price continued to decline.  On August 23, 2019, the Company's failure to satisfy its obligations under one of its credit agreements forced

---

[1] http://aureliusvalue.com/research/teum-where-are-the-customers/
[2] https://viceroyresearch.files.wordpress.com/2019/06/pareteum-26062019.pdf

Pareteum to amend the agreement by issuing more than 1 million shares to the creditor, thereby diluting the Company's stock.

11.     On this news, the Company's shares fell $0.29, or nearly 11%, to close at $2.47 per share on August 23, 2019, on unusually heavy trading volume

12.     On September 20, 2019, in increasingly dire financial straits, the Company announced another highly dilutive offering of 18.8 million shares of the Company's common stock and 3.8 million units of warrants to purchase shares of the Company's stock, priced at $40 million.

13.     On this news, the Company's shares fell $0.17 per share, or over 9%, to close at $1.67 per share on September 20, 2019, on unusually heavy trading volume.

14.     On October 15, 2019, Denis McCarthy, who had maintained the Company's backlog spreadsheets, was terminated as Chief Operating Officer.

15.     On this news, the Company's shares fell $0.36, or over 30%, over three consecutive trading sessions to close at $0.83 per share on October 17, 2019, on unusually heavy trading volume.

16.     Then on October 21, 2019, Pareteum disclosed that its financial statements for the year ended December 31, 2018 and quarters ended March 31, 2019 and June 30, 2019 would be restated because the Company had "prematurely or inaccurately recognized revenue" flowing from certain customer transactions.

17.     On this news, the Company's share price fell $0.44, or nearly 60%, to close at $0.30 per share on October 22, 2019, on unusually heavy trading volume

18.     Soon after, Pareteum's Chief Executive Officer and Chief Financial Officer were terminated from their positions.

19.     These revelations precipitated the filing of a securities class action in the U.S.
District Court for the Southern District of New York against Pareteum and certain of defendants,
*In re Pareteum Securities Litigation*, 1:19-cv-09767-AKH (the "Securities Class Action").

20.     Plaintiff did not make a litigation demand prior to filing this action because such
demand would have been futile based upon the composition of the Board and the actions taken by
the Board.  The Board is currently composed of five members, four of whom are named in this
action.   As alleged herein, at least three directors allowed misleading statements to be
disseminated: the three directors on the Company's Audit and Finance Committee failed to ensure
the effectiveness of Pareteum's internal controls and integrity of its financial statements.  Thus,
more than half the members would be interested in a demand to investigate their own wrongdoing.

## II.      JURISDICTION AND VENUE

21.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this
Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of
1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant
to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the
United States which it would not otherwise have.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because
the Company is incorporated in Delaware, and the Defendants have received substantial
compensation in this district by engaging in numerous activities that had an effect in this District.

## III.     PARTIES

**Plaintiff**

23.     Plaintiff Brad Linton purchased Pareteum stock in January 2018 and has
continuously owned his Pareteum stock since that date.

**Nominal Defendant**

24.     Nominal Defendant Pareteum is a Delaware corporation with its principal executive offices located at 1185 Avenue of the Americas, New York, NY 10036.  The Company stock trades on the NASDAQ stock exchange under the symbol "TEUM."

**Defendants**

25.     Defendant Robert H. Turner ("Turner") served as the Chief Executive Officer ("CEO") of the Company from May 24, 2019, and as the Executive Chairman of the Board from November 16, 2015, until he was terminated from his positions with Pareteum on November 22, 2019.  For the fiscal year ended December 31, 2018, Defendant Turner received $5,281,843 in compensation from the Company: $321,225 in salary, a $600,000 bonus, $2,921,563 in bonus stock awards, and $1,439,055 in all other compensation.

26.     Defendant Edward O'Donnell ("O'Donnell") served as the Chief Financial Officer ("CFO") of the Company from January 9, 2017 to November 1, 2019.  His status with the Company is currently under review.  For the fiscal year ended December 31, 2018, Defendant O'Donnell received $437,948 in compensation from the Company: $212,197 in salary, a $60,000 bonus, $151,397 in option awards, and $14,354 in all other compensation.

27.     Defendant Denis McCarthy ("McCarthy") served as the Chief Operating Officer ("COO") of the Company from May 24, 2019 to October 9, 2019, when he was terminated.  He served as Pareteum's President from October 1, 2018 to May 24, 2019.  For the fiscal year ended December 31, 2018, Defendant McCarthy received $354,192 in compensation from the Company: $198,509 in salary, $138,021 in option awards, and $17,662 in all other compensation.

28.     Defendant Laura Thomas ("Thomas") has served as interim CFO since November 1, 2019.  She served as a director of the Company from July 25, 2017 to November 28, 2018, when she resigned.

29.     Defendant Victor Bozzo ("Bozzo") has served as the Chief Commercial Officer ("CCO") of the Company since May 24, 2019.  Bozzo served as Pareteum's CEO from November 1, 2016 to May 24, 2019.  For the fiscal year ended December 31, 2018, Defendant Bozzo received $2,161,536 in compensation from the Company: $293,162 in salary, a $325,000 bonus, $687,788 in bonus stock awards, $460,064 in option awards, and $395,521 in all other compensation.

30.     Defendant Luis Jimenez-Tuñon ("Jimenez-Tuñon") has served as a director of the Company since March 1, 2017.

31.     Defendant Robert Lippert ("Lippert") has served as a director of the Company since November 16, 2018.

32.     Defendant Yves van Sante ("van Sante") has served as a director of the Company since June 1, 2014.

33.     The defendants named in ¶¶25-32 are sometimes referred to hereinafter as the "Individual Defendants."  The defendants named in ¶¶25, 28, 30-32 are sometimes referred to hereinafter as the "Director Defendants."

**Non-Parties**

34.     Mary Beth Vitale has been the non-executive interim Chairman of the Board since November 22, 2019.

35.     Bart Weijermars has been interim CEO since November 22, 2019 and Chief Strategy Officer since May 2018.

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers, directors, and/or fiduciaries of Pareteum and because of their ability to control the business and corporate affairs of Pareteum, at all relevant times, the Individual Defendants owed Pareteum and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage

Pareteum in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of Pareteum and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to Pareteum and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Pareteum, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with Pareteum, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

38.    To discharge their duties, the officers and directors of Pareteum were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of Pareteum were required to, among other things:

(a)    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d)    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V.      RELEVANT BACKGROUND

### A.      Company Overview

39.      Pareteum provides global cloud communications services, including voice, video, text messaging, and data services, to its customers, which include early stage businesses, software developers, and communications service providers.

40.      Until November 2015, the Company was known as Elephant Talk Communications Corp., a declining penny stock company with few positive business prospects.

41.      Then, defendant Turner was appointed as Executive Chairman of the Board and led a significant restructuring of the Company, including its rebranding as Pareteum, a 1-to-25 reverse stock split, and the appointment of defendant Bozzo as CEO in November 2016.  These changes helped increase the Company's market capitalization significantly, from less than $20 million during December 2016, to as high as $569 million during May 2019.

42.      Pareteum approximates its growth potential using 36-month contractual revenue backlog ("36MCRB"), which is revenue purportedly owed to the Company through its contracts with customers.  For instance, for the fiscal year ended December 31, 2017, the Company's backlog totaled $147 million, which ballooned to $615 million during the fiscal year ended December 31, 2018. The Company defines its backlog as follows:

> Contractual revenue backlog, a Non-GAAP measure is measured on a forward looking 36 month snapshot view monthly, and, is generated by each of the Company's Managed Services, Global Mobility Cloud, and Application Exchange & Developer's Platform customers.

### B.      Applicable Accounting Standards

43.      Under applicable SEC rules and regulations, Pareteum must prepare and file financial statements in accordance with generally accepted accounting principles ("GAAP").  Financial statements that are not in compliance with GAAP are presumed misleading by the SEC.

44.     The Financial Accounting Standards Board ("FASB") provides guidance in the FASB Statements of Financial Accounting Concepts (the "Concepts Statements") regarding when and how to record events in financial statements and related reports according to GAAP.

45.     Concepts Statement No. 1 provides that "[f]inancial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit, and similar decisions."  FASB Concepts Statement No. 1, *Objectives of Financial Reporting by Business Enterprises* (2008) at 11.

46.     Concepts Statement No. 1 also provides that "[f]inancial reporting should provide information about an enterprise's financial performance during a period." *Id.* at 13.

47.     Concepts Statement No. 2 provides that "[t]he reliability of a measure rests on the faithfulness with which it represents what it purports to represent, coupled with an assurance for the user, which comes through verification, that it has that representational quality."  FASB Concepts Statement No. 2, *Qualitative Characteristics of Accounting Information* (2008) at 18.

48.     Concepts Statement No. 2 also provides that for a financial report to be complete, "nothing material is left out of the information that may be necessary to insure that it validly represents the underlying events and conditions."  *Id.* at 21.

49.     Additionally, Concepts Statement No. 2 provides that "[c]onservatism is a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered." *Id.* at 24.

50.     Moreover, SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies with respect to their finances and operations.  Specifically, Item 303 of Regulation S-K requires that all Form 10-Qs and 10-Ks filed with the SEC include a

"Management's discussion and Analysis of Financial Condition and Results of Operations"

("MD&A") section.  Item 303(a)(3) provides that the MD&A section must:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

51.     As such, the Individual Defendants had a duty under Item 303 of Regulation S-K to disclose that the Company was unlikely to collect revenue from certain customer transactions, as these transactions constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, and (ii) known trends or uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income.

## VI.   SUBSTANTIVE ALLEGATIONS

### A.   The Individual Defendants Issue False and Misleading Statements

52.     On December 14, 2017, defendant Turner caused the Company to publish a letter to shareholders on its website, stating, in relevant part:

> ***2017 Accomplishments Expected to Create Continued Growth and Market Innovations in 2018***

> ***36 Month Contractual Revenue Backlog Grows to $129 Million at November 30, 2017***

> \* \* \*

These past two years, since I was appointed as Executive Chairman and Principal Executive Officer of Pareteum in November 2015, have been extremely eventful and successful. ***Our restructuring and repositioning in 2016 has led to solid growth in 2017, and has defined our innovation in both services and market positioning, establishing a strong outlook for our success in 2018 and beyond***. We again thank you for your patience.

* * *

Through TEUM's accretion of the current $129 million 36 Month Contractual Revenue Backlog (see definition below), our customer base increased from 4 as of year-end 2016 to currently 21 customers. ***This is the result of a strong TEUM effort by all our TEUMates, across all departments, including Vic Bozzo, Rob Mumby, Nick Barter, Eduardo Gimeno, Ali Davachi, Ted O'Donnell and many others that carry on every day, doing their jobs to serve our customers and create profitable growth***. We have expanded into new markets and have provided new services as a result of the complete overhaul of our software and platform in order to fully support our Software as a Service business model, which we converted to in 2016.

(Emphasis added).

53.     On December 19, 2017, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to publish a PowerPoint presentation stating that Pareteum had issued over $13 million in new revenue backlog, and emphasized, "[the Company's] [p]ath to profitability is accelerated via high margins on subscribers and the magic of monthly recurring revenue will drive sustainable returns."

54.     On this news, the Company's stock price increased from $0.72 per share at the close of trading on December 14, 2017, to $1.65 per share at the close of trading on December 19, 2017.

55.     On December 26, 2017, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to issue a press release announcing that Pareteum had added support for blockchain technology to the Company's billing and settlement services, stating in relevant part:

The new feature being offered to all Pareteum's Global Mobility Cloud customers will allow them to not only accept the crypto-currencies but also to perform payment processing and settlements with their partners in any currency. For

example, in the case of Smart Cities in emerging markets, creation of their own local crypto-currencies is now a reality, facilitating primary economic benefit with the cities for their citizens. Last year, Pareteum announced a partnership with Airfox to integrate their advertising subsidy platform into the Application Exchange and Developer's Platform exchange based on the requirement for advertising to subsidize the costs of growing data service usage. Since then subsidies have gone beyond advertising and into micro-loans and cryptocurrency as the mobile phone penetrates more of daily life.

56.     On January 2, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to issue a press release announcing expedited deployment of its services for a $3 million contract with an Indian customer.  In the press release, defendant Turner stated, in relevant part:

> Our first India located customer chose Pareteum because of our feature rich global platform and connectivity, with its developer Application Programming Interfaces (API) framework. ***Pareteum's selection was based on*** the profitable customer value derived from our cloud, its connectivity, ***and the ease of doing business with us. Now, with our newly supported mobile payments and Blockchain capabilities*** plus their expectation of future mobile services and capabilities, ranging from Artificial Intelligence (AI), Machine Learning (ML) and Internet of Things (IoT), we expect to grow with our customer in India, and everywhere they choose to do business.

57.     On January 22, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to issue a press release announcing that it had expanded its relationship with AirFox, a blockchain technology company, by incorporating certain of AirFox's platforms into the Company's software platform.  The press release quoted defendant Turner:

> Pareteum and AirFox form a highly complementary technology partnership. These new converged services, centered on the security offered via Blockchain and Pareteum's open source developed award winning software services for communication service providers, extend TEUM's s abilities for person to person mobile payments, that are trusted. We see new markets, faster services adoption and deeper market penetration occurring, as well as our inevitable march toward cloud based self-services, utilizing our insights gleaned from data analytics, for everything. This bodes well for our partners AirFox and for Pareteum, in fundamental revenue growth and profitability.

58.    In the same press release, defendant Bozzo stated: "As we forge further into underserved markets, the advantage of the new Internet paradigm shift in mobile allows investors to crowdsource regional opportunities that were previously reserved for local services only."

59.    On January 31, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to issue a press release announcing that it had signed contracts scheduled to add $15.2 million to the Company's backlog.  The press release stated, in relevant part:

> [D]uring the month of January 2018, the Company signed contracts scheduled to add $15,200,000 to its 36-month contractual revenue backlog. The current contractual revenue backlog represents a 400% increase from a year earlier and a 10% month over month increase to the $147,000,000 36-month contractual revenue backlog announced previously on January 3, 2018.
>
> * * *
>
> Contracts executed in January 2018 that have meaningfully contributed to Pareteum's accelerating growth, as measured by our 36-month contractual revenue backlog, are:
>
> - • $1,000,000 contract from Social Media Provider to Enable Smartphone Services, announced January 4, 2018
>
> - • $5,400,000 contract from Pan European Mobile Operator with African Subscribers, announced January 10, 2018
>
> - • $3,000,000 contract from South America Data Network Provider to Add Mobility, announced January 17, 2018
>
> - • $1,000,000 contract from Brazil Mobile Service Provider, announced January 24, 2018
>
> - • $10,000,000 contract awarded to Pareteum Europe for MSP deployment to EMEA customer, announced January 26, 2018

60.    In the same press release, defendant Turner stated: "Pareteum's performance is highlighted by the growth of our 36-month contractual revenue backlog, currently standing over $162,000,000, which represents a Compound Annual Growth Rate (CAGR), measured from the end of 2016's fourth quarter through 2017 of 400%!"

61.     On February 6, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to issue a press release about new opportunities with respect to blockchain technology and the broader communications market.  Therein, defendant Turner stated:

> The Digital Economy, and its monetization, requires trust, identity and device, identification, for the dependable completion of transactions. These transactions may be payment system, financial, or application and content focused. ***Pareteum's support of an enabling Blockchain powered solution assures that our communications service provider customers, and, their retail, enterprise, and IoT customers, are provided the highest available, GDPR compliant, security and payment systems solutions.*** In conjunction with our partner, AirFox, Pareteum's cloud platform will also service its customers by capturing new revenue streams in the telecommunications and IoT markets. Our cloud-based solution will enable the deployment of Blockchain services, delivered for our customers anywhere in the world.

62.     On February 12, 2018, defendant Turner caused the Company to publish a letter to shareholders on its website, stating:

> The TEUM of Pareteum Corporation continues to be hard at work, globally. We have had ***a fast start to 2018 with excellent results in January*** through the collective group initiatives of:
>
> •       Rob Mumby + his key sales executives and sales support TEUM;
>
> •       Ali Davachi + his key operations, technical support and service delivery TEUM;
>
> •       Denis McCarthy + his key corporate development TEUM;
>
> •       Ted O'Donnell + his accounting and finance TEUM
>
> •       And, as always, Vic Bozzo and his indomitable leadership, especially in the sales arena, to make things happen;
>
> I am happy to report that our executive team, with its key leadership management team, is continuing to produce results. We have a very big and bright 2018 planned. So far this year, in January alone, our TEUM signed $20.4 million of new contracts, spanning the globe, from Brazil to Africa to Europe. $15.2 million was additive to our now record high $162 million 36-month contractual revenue backlog, as two of the awarded contracts are 5-year agreements. I am extremely proud of our TEUM's accomplishments ***as we have accelerated the growth of our backlog from $60***

*million at June 30, 2017 to $162 million as of January 31, 2018. We expect the pace to accelerate during the year and that our reported results will reflect the hard work that has gone into the turnaround of our company.*

\* \* \*

We are proud to be debt-free with substantial cash to operate and grow our business. *We are putting these dollars to work throughout 2018 (and beyond) in a manner that we believe will yield the maximum shareholder value to TEUM* through:

- Profitable Sales growth

- Product and services development, with a detailed build or buy analysis applied

*Pareteum continues to win new long-term contractual business at an unprecedented pace, as evidenced by our 36-month contractual revenue backlog. We expect this pace to increase throughout the year*.

(Emphasis added).

63.     The letter also included a link to a presentation discussing the Company's backlog, which contained the following graphic:



64.     On February 28, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to issue a press release announcing a 3-year contract with Global Cloud Services, which would add over $10 million to the Company's backlog. In the

press release, defendant Bozzo stated: "This contract is a major milestone for continued growth. Being awarded this contract demonstrates that the technology and strategy of Pareteum's turn-key solution for launching mobile network operators is being widely adopted across the globe."

65.     On this news, the price of the Company's stock increased from $2.00 per share at the close of trading on February 27, 2018, to $2.28 per share at the close of trading on February 28, 2018.

66.     On March 21, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to issue a press release announcing a 5-year contract with an Africa-based Mobile Virtual Network Operator, which would add another $10 million to the Company's backlog.  In the press release, defendant Bozzo stated: "Pareteum's MSP Platform is a perfect fit for the contract with our newest global client. This part of the world represents high growth in connections as the digital economy takes over. We are pleased with Rob Mumby and his team as they continue to add customers to our platform."

67.     On this news, the price of the Company's stock increased from $2.85 per share at the close of trading on March 20, 2018, to $3.35 per share at the close of trading on March 21, 2018.

68.     On March 30, 2018, defendants Turner O'Donnell, Bozzo, Jimenez-Tuñon, Thomas, and van Sante caused the Company to file its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2017 (the "2017 10-K"), reporting $13.5 million revenue. The 2017 10-K was signed by Defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Thomas, and van Sante.  In addition, defendants Turner and O'Donnell signed certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements, the disclosure of any material

changes to the Company's internal controls, and the disclosure of any fraud committed by the

Company, its officers, or its directors.

69.     Regarding revenue recognition, the 2017 10-K stated:

For the mobile solutions services the Company recognizes revenues from customers accessing our cloud-based application suite in two different service offerings, namely managed services and bundled services.

For managed services, revenues are recognized for network administration services provided to end users on behalf of Mobile Network Operators (MNO) and virtual Mobile Network Operators (MVNO's). Managed service revenues are recognized monthly based on an average number of end-users managed and calculated on a pre-determined service fee per user. For bundled services, the Company provides both network administration as well as mobile airtime management services. Revenues for bundled services are recognized monthly based on an average number of end-users managed and mobile air time and calculated based on a pre-determined service fee. Technical services that meet the criteria to be separated as a separate unit of accounting are recognized as the services are performed. Otherwise they are deferred and recognized over the contract term. Our arrangements with customers do not provide the customer with the right to take possession of the software supporting the cloud-based application service at any time.

Telecommunication revenues were recognized when delivery occurred based on a pre-determined rate and number of user minutes and number of calls that the Company has managed in a given month.

Professional services and other revenue include fees from consultation services to support the business process mapping, configuration, data migration, integration and training. Amounts that have been invoiced are recorded in accounts receivable and in net billings in excess of revenues or revenue, depending on whether the revenue recognition criteria have been met. Revenue for professional and consulting services in connection with an implementation or implantation of a new customer that is deemed not to have stand-alone value is recognized over the contractual period commencing when the subscription service is made available to the customer. Revenue from other professional services that provide added value such as new features or enhancements to the platform that are deemed to have standalone value to the customer or are sold separately from the original hosting arrangement, are deferred and revenue recognition occurs when the feature is activated.

70.     The 2017 10-K also stated that Pareteum's "disclosure controls and procedures

were effective as of December 31, 2017" and that there were "no changes in [its] internal control

over financial reporting . . . that have materially affected, or are reasonably likely to materially affect, [its] internal control over financial reporting."

71.     On April 9, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to announce that it expected to report at least $4.1 million in revenue for the fiscal quarter ended March 31, 2018, representing 47% growth.  In the press release, defendant Turner stated:

> Our TEUM ended the 2017 year with a very strong fourth quarter as demonstrated by the acceleration in revenues. This momentum led to a robust first quarter of 2018 with continued year-over-year growth expected throughout the year. This momentum is a result of our success in converting our contract revenue backlog into connections which generates revenues.

72.     On April 16, 2018, defendant Turner caused the Company to publish a letter to shareholders on its website claiming that "Pareteum is on to a rapid start for 2018 in all meaningful areas."  The letter also stated, in relevant part:

> We have continued to experience financial improvements during the first few months of 2018. With our Software-as-a-Service (SaaS) business model, we have excellent visibility into our business operations and revenue recognition. This enabled us to pre-announce our first quarter, ended March 31, 2018 revenue, of $4.1 million, just a week after the quarter's ended, and, which represents 47% growth for the first quarter ended March 31, 2018. This is significant because it represents a reversal of the prior year's Q1 seasonal revenue decrease, and a sequential quarter over quarter revenue increase. This reflects the increasing role our Global Cloud is playing in revenue contribution, and, its ongoing potential. It is also significant that "connections" (our term representing devices, subscribers and their variable usage), which are a lead indicator of revenue, rose to 2,220,000 as of March 31, 2018. This connections growth of 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017, gives management confidence.

73.     On May 7, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to issue a press release announcing first quarter 2018 financial results, reporting revenue of $4.113 million.  The press release also stated, in relevant part:

**Key Business Highlights for First Quarter 2018:**

- Awarded 14 contracts aggregating to $60 million in total contract value, which added $53 million to 36-month contractual revenue backlog

- Increased 36-month contractual revenue backlog from $147 million at 12/31/17 to $200 million

- Backlog revenue conversion at 103%

- Non-GAAP EPS of $0.02 cents

- Ended Q1 2018 with 2,200,000 connections, a lead indicator of revenue, increased 94% versus the end of the first quarter 2017 and 30% from the sequential fourth quarter of 2017, with an additional conversion increase of 70% versus the expected in the 36-month contract backlog for connections

* * *

**Raised 2018 Outlook to At Least 60% Revenue Growth 2018 Outlook:**

Based on our 36-month contractual revenue backlog of $200 million, as of March 31, 2018, and 2,200,000 connections, we are raising our 2018 outlook. The Company now expects 2018 revenue growth of at least 60% over 2017, up from the previous provided guidance of 50%. Also, with its current cost structures, Pareteum expects positive, EBITDA, and cash from continuing operations for the full year 2018. As we convert backlog to connections, our revenue will increase and for every incremental dollar of revenue, we expect contribution to our bottom line. Our target gross margins are 70-75%.

74.     The May 2018 8-K also quoted Defendant Turner, who stated the following:

This quarter represents a record quarterly revenue milestone since we executed our turnaround and transformed the business in 2016. I am also extremely pleased and proud to report that we generated positive operating cash flow in the first quarter, a full quarter earlier than expected. First quarter revenue would have been $4.22 million, but we instituted Accounting Standard for Revenue Recognition (606) for our SaaS business model and did not recognize $107,000 of deferred revenue in the first quarter. All of our profitability metrics improved dramatically; Adjusted EBITDA, EBITDA, operating loss and cash flow from operations. Key performance indicators of connections, backlog conversion, connection values, revenue per employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. We also invested in product development and sales and marketing during the quarter, as we prepare to scale our business for expected growth and profitability. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value.

(Emphasis in original).

75.     On May 11, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2018 (the "1Q18 10-Q"), affirming the previously reported financial results.  The report was signed by defendants Turner and O'Donnell, who also signed certifications pursuant to SOX attesting to the accuracy of the 1Q18 10-Q.

76.     Regarding controls over financial reporting, the 1Q18 10-Q stated that its "disclosure controls and procedures are effective."  The report also stated, in relevant part:

Changes in Internal Control Over Financial Reporting

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the Company's internal controls, there have been no additional changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

77.     Regarding compliance with GAAP, the 1Q18 10-Q stated, in relevant part:

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation SX. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three months ended March 31, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

78.     On July 10, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused Pareteum to announce that it expected to report at least $5.75 million in revenue for the fiscal quarter ended June 30, 2018, representing 78% growth over the prior year period and 40% sequential growth.

79.     The press release also quoted defendant Turner:

[We] surged into 2018 with strong first quarter results, demonstrated by the acceleration in revenues and connections. This momentum has continued into the second quarter, at an accelerating rate, because of rapid conversions of our 36 Month Contractual Revenue Backlog. We see this translating into our best quarter, ever. We anticipate continued improvement in our results and execution of our long-term strategies, aimed at open mobility and open applications, globally delivered as part of excellent customer experiences in every engagement.

80.     On August 2, 2018, defendants Turner, O'Donnell, Thomas, Jimenez-Tuñon, and van Sante caused Pareteum to announce that its backlog had grown to $301 million, "a 393% increase from a year earlier, when in July 2017, [its] 36MCRB was $61 million."

81.     In the same press release, defendant Turner stated:

Our customers are telling us that 'telecom needs to change'. We have been listening. We are 'software', and, that is what has changed, and will even more disruptively continue to change how we receive content and communicate. Pareteum, and, its Global Software Defined Cloud, have made dramatic leaps forward in fulfilling our vision of software-driven open mobility and applications that make our customers happy. The evidence is clear in the number of new contracts being signed and the rate at which customers are subscribing to our software services. This latest triumph delivers on what we said we would do, and the results show it. We are a force to be reckoned with. Our momentum will not stop here: our vision to provide connectivity for *Any Device, Any Network, Anywhere*™, continues to disrupt the industry. **We are on a torrid sales pace and we are On Fire with relentless forward motion and passion** for customers and meeting their global service needs.

(Emphasis in original).

82.     The above statements in ¶¶ 52-53, 55-64, 66, 68-81 were materially misleading because they failed to disclose: (1) that the Company was unlikely to collect revenue from certain customer transactions; (2) that, as a result, Pareteum had improperly recognized revenue derived

from these transaction; (3) that, as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) that, as a result, the Company's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (5) that the Company was reasonably likely to restate certain financial statements; and (6) that certain of the Company's officers and directors, including defendants Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct.

83.     On August 3, 2018, defendants Turner, Jimenez-Tuñon, Thomas, and van Sante issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held on September 13, 2018.  In the 2018 Proxy Statement, these four Individual Defendants solicited stockholder votes in favor of seven management proposals, including: (i) a proposal to acquire Artilium plc in exchange for the Company's common stock; (ii) a proposal to elect Turner, Jimenez-Tuñon, Thomas, and van Sante to new terms as directors; (iii) a proposal to approve the 2018 Long-Term Incentive Compensation Plan (the "2018 Incentive Plan"); and (iv) a proposal to approve compensation for Pareteums named executive officers.

84.     The proxy statement disclosed that the Board had determined that defendant Turner was not an independent director.  According to the proxy statement, the Board maintained an Audit Committee tasked with oversight of, among other things, the Company's financial statements:

> The Audit Committee is composed of Messrs. van Sante (member since February 18, 2016) and Jimenez-Tuñon (member since March 1, 2017) and Ms. Thomas (member since July 25, 2017, Chairwoman effective September 13, 2017). Ms. Thomas serves as the Audit Committee financial expert. The Audit Committee met four times during 2017 and acted by unanimous written consent four times in 2017. Each of the then-current members was present at all of the Audit Committee meetings held during 2017.
>
> The Audit Committee oversees our corporate accounting, financial reporting practices and the audits of financial statements. For this purpose, the Audit and

Committee has a charter (which is reviewed annually) and performs several functions. The Audit Committee:

- evaluates the independence and performance of, and assesses the qualifications of, our independent auditor, and engages such independent auditor;

- approves the plan and fees for the annual audit, quarterly reviews, tax and other audit-related services, and approves in advance any non-audit service to be provided by the independent auditor;

- reviews and approves related-party transactions;

- monitors the independence of the independent auditor and the rotation of partners of the independent auditor on our engagement team as required by law;

- reviews the financial statements to be included in our Annual Report on Form 10-K and Quarterly Reports on Form 10-Q and reviews with management and the independent auditors the results of the annual audit and reviews of our quarterly financial statements;

- oversees all aspects our systems of internal accounting control and corporate governance functions on behalf of the Board of Directors; and

- provides oversight assistance in connection with legal, ethical and risk management compliance programs established by management and the Board of Directors, including Sarbanes-Oxley implementation, and makes recommendations to the Board of Directors regarding corporate governance issues and policy decisions

85.     With respect to the Company's Code of Conduct, the 2018 proxy statement stated, "[t]he code of conduct applies to all employees, as well as each member of our Board of Directors. All employees are required to read the code of conduct and affirm in writing their acceptance of the code."

86.     Regarding non-employee director compensation, the 2018 proxy statement told stockholders that Jimenez-Tuñon received $374,065 in compensation from Pareteum in 2017 for his service on the Board, Thomas received $99,608, and van Sante received $346,517.  In addition to this excessive compensation, the 2018 Incentive Plan authorizes the issuance of eight million

shares of the Company's common stock, with a 15% annual increase to the total number of reserved shares, for equity awards to Pareteum employees and directors.

87.     According to the 2018 proxy statement, the 2018 Incentive Plan is administered by the Board or by one or more committees appointed by the Board:

> The Board of Directors shall administer the 2018 Plan. The Board of Directors may, by resolution, appoint the Compensation Committee to administer the 2018 Plan and delegate its powers under the 2018 Plan for purposes of Awards granted to Eligible Employees and Consultants.

Thus, equity pursuant to the 2018 Incentive Plan is effectively awarded at the discretion of the Board.

88.     The 2018 proxy statement solicited shareholder ratification of the 2018 Incentive Plan, which had been approved by the Board in July 2018.

89.     The 2018 Proxy Statement was materially misleading because it failed to disclose: (1) that the Company was unlikely to collect revenue from certain customer transactions; (2) that, as a result, Pareteum had improperly recognized revenue derived from these transaction; (3) that, as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) that, as a result, the Company's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (5) that the Company was reasonably likely to restate certain financial statements; (6) that certain of the Company's officers and directors, including defendants Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct; (7) that it misrepresented the Board's actual activities with respect to financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (8) that each of the non-employee directors was interested in their own grants of discretionary compensation.

90.    On August 6, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to announce its second quarter 2018 financial results in a press release that stated, in relevant part:

**Key Financial Highlights for Second Quarter 2018 Year over Year:**

- Revenues increased by 85% to $6 million

- Net Income of $1.7 million versus net loss of ($1.3 million) in the second quarter of 2017

- EBITDA improved by over $898K, or 298%, to $597,263

- Adjusted EBITDA improved by over $834K, or 180%, to $1.3 million

- Operating loss reduced by $776K, or 66%, to $397K

- Increase in total assets from $11.6 million to $33.1 million

- Cash balance of $19.2 million

- Operating cash flow adjusted for restructuring and acquisition related costs of $565 for the six months ended June 30, 2018

- Initiated reporting on dollar based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 161% in Q2 vs Q1

**Key Business Highlights for Second Quarter 2018:**

- Awarded 13 contracts aggregating to $55 million in total contract value, which added $55 million to 36-month Contractual Revenue Backlog

- Increased 36-month Contractual Revenue Backlog from $200 million at End of the first quarter of 2018 to $276 million; includes $21 million incremental from existing contracts

- Contractual Revenue Backlog conversion rate at 106%

- Ended the second quarter of 2018 with 2,713,600 Connections, an increase of 225% over the end of the second quarter of 2017 and 23% higher than the first quarter of 2018

(Emphasis in original)

91.     In the press release, defendant Turner stated:

The quarter ended June 30, 2018, marks the achievement of materially significant milestones for Pareteum as it continues to evolve into a high-growth, software-based, enabling cloud services company. Our results include attainment of positive Net Income and positive EBITDA for the first time in Company history. ***Surpassing $6 million in revenues in the second quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue.*** Today we operate with our Global Enablement Cloud, fueled by the award winning, and, customer affirmed, software applications, solutions and application programming interfaces (APIs). It is this combination that is making our services and software the developer community's first choice for connectivity and communications. We generated positive EBITDA and Net Income, validating the efficient scalability of our business. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. ***Key performance indicators of Connections, Contract Revenue Backlog conversion, Connection values, revenue-per-employee and churn continue to all move in the right direction*** and give us confidence in our overall strategy and business execution. ***Our TEUM remains laser focused on converting backlog to revenue,*** servicing our clients, selling into new geographical markets and creating shareholder value.

(Emphases added.)

92.     On August 13, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2Q18 10-Q"), affirming the previously reported financial results.  The report was signed by defendants Turner and O'Donnell, who also signed certifications pursuant to SOX attesting to the accuracy of the 2Q18 10-Q.

93.     Regarding controls over financial reporting, the 2Q18 10-Q stated that Pareteum's "disclosure controls and procedures are effective."  The report also stated, in relevant part:

Changes in Internal Control Over Financial Reporting

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the Company's internal controls, there have been no additional changes in the Company's internal control over financial reporting that occurred during the Company's fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, the Company's internal control over financial reporting.

94.     Regarding compliance with GAAP, the 2Q18 10-Q stated, in relevant part:

The interim condensed consolidated financial statements have been prepared in accordance with accounting principles generally accepted in the United States, or GAAP, for interim financial information and with the instructions to Securities and Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation SX. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2017, included in our 2017 Annual Report on Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three and six months ended June 30, 2018 are not necessarily indicative of the results to be expected for future quarters or the full year.

95.     On September 13, 2018, the Company filed with the SEC a Form 8-K disclosing the results from the votes on the proposals contained in the 2018 proxy statement.  In particular: (i) the Artilium acquisition was approved; (ii) Turner, Jimenez-Tuñon, Thomas, and van Sante were reelected to terms as directors; and (iii) the 2018 Incentive Plan was ratified.

96.     On September 17, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to announce that it had entered into new contracts worth a total of $50 million in August 2018.  In the press release, defendant Turner stated that "[c]ustomers are accelerating new revenues and substantial savings in ever increasing numbers."

97.     The same day, defendant Turner promoted Pareteum's contract with Eyethu Mobile Network on his Twitter account:



98.     On October 2, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused Pareteum to announce that it had entered into new contracts yielding $15 million over three years.  The press release stated, in relevant part:

> [The Company] today announced that it has signed new contracts with Parallax Health Sciences in the U.S., oneCentral in the Netherlands, and Naledi in South Africa totaling $15 Million over three years. New customers will use Pareteum's cloud platform as a service offering to enable voice, mobile, and device and data-monitoring for their companies. These use cases are made possible through the recently-merged Artilium and Pareteum products.
>
> * * *
>
> "Pareteum's momentum continues to grow as we close on these multimillion dollar contracts," said Vic Bozzo, chief executive officer of Pareteum. "With these new use cases, we are not only building a pipeline for our growing business, but also enabling mobile solutions for companies across industries, including the ever-important healthcare technology space.

99.     On October 5, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to announce that it expected to report at least $8 million in revenue for the fiscal quarter ended September 30, 2018, representing 129% growth over the prior year period and 33% sequential growth.  In the press release, defendant Turner stated:

> Pareteum continues to surge through 2018; with our expectation of superior financial and operating results for the third quarter. ***Our acceleration in revenues and connections proves it, and there's more to come.*** We are focused on forward momentum, and it is happening as we move into the fourth quarter. Why? Because our existing customers are buying more from us and we are signing on new ones. This sales performance, ***coupled with our daily-accelerating 36-Month Contractual Revenue Backlog conversion***, provides a favorable outlook for our business, even before we complete the operational integration of our newly-

acquired Artilium, which is also performing well. We are in a good place for our company.

(Emphases added.)

100.    On October 8, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to announce that it had entered into a three-year contract with a new customer in Asia for over $50 million.  The press release stated:

> [The Company] today announced a $50 million contract with One Development, Thailand's first mobile virtual network aggregator and enabler, and leader in the country's growing mobile virtual network operator market. Pareteum's cloud software platform will power One Development's ability to offer a turnkey solution to the over 50 companies that have obtained a mobile virtual network operator license in Thailand.

101.    On October 17, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to announce that it had entered into agreements with four new customers for $8 million.  The press release also quoted Pareteum's Chief Revenue Officer, Rob Mumby ("Mumby"):

> Pareteum is excited to be at MVNO North America, where we look forward to meeting new customers like monogoto and Nextelle. Our customers are the reason Pareteum's momentum continues to grow. . . .With these new use cases, we are not only building a pipeline for our growing business, but also showing potential customers the broad reach of our platform as a service, including smart metering and pet tech.

102.    On October 24, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused Pareteum to announce that its backlog had increased to $500 million, in part due to the Company's acquisition of Artilium, a software development company. The press release stated:

> [The Company] today announced that its current 36-Month Contractual Revenue Backlog (36MCRB) has grown to $500 million; this number includes the backlog incorporated with Pareteum's recent acquisition of Artilium and excludes certain monthly recurring revenue streams deriving from that acquisition for which long-term contracts are not in place.

- This milestone for Pareteum represents a 1,150% increase year over year since 2016: at year end 2016, Pareteum announced $40 million 36MCRB; at year end 2017, the company announced $147 million; and now, ten months into this year, Pareteum has reached $500 million in 36MCRB.

- During the same period, Pareteum's quarterly booked revenue increased by 260%.

- The company continues to convert backlog at greater than 100% of the contract schedules over the life of the agreement.

103.    On November 7, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused the Company to announce its third quarter 2018 financial results in a press release that stated, in relevant part:

- Revenues of $8 Million, up 129% Year-Over-Year

- Adjusted EBITDA of $1.8 Million

- Non-GAAP EPS of $0.01

- Raised 2018 Outlook to 100% Revenue Growth

- Dollar-Based Net Expansion Rate of 147%

**Key Financial Highlights for Third Quarter 2018 Year over Year:**

- Revenues increased by 129% to $8 million

- Adjusted EBITDA improved by over $1.2 million, or 195%, to $1.8 million

- Non-GAAP Earnings Per Common Share improved to $0.01 for Q3 2018, compared to ($0.12) for Q3 2017

- Increase in total assets from $10 million to $35 million

- Cash balance of $18.9 million

- Dollar-based expansion rate where customers of record in 2017 have grown their revenue dollar spending by 147% in the third quarter of 2018 versus the third quarter of 2017

**Key Business Highlights for Third Quarter 2018:**

- Awarded 19 contracts aggregating to $403 million in total contract value, which added $127 million to 36-month Contractual Revenue Backlog

- Increased 36-Month Contractual Revenue Backlog from $276 million at
  end of the second quarter of 2018 to $403 million; includes $72 million
  incremental from existing contracts

- Contractual Revenue Backlog conversion rate at 100%

- Ended the third quarter of 2018 with 2,903,000 Connections, an increase of
  127% over the end of the third quarter of 2017 and 7% higher than the
  second quarter of 2018

"The quarter ended September 30, 2018, marks our continued evolution into a high-growth, software-based, enabling cloud services company. ***Surpassing $8 million in revenues in the third quarter demonstrates the efficiency of our employees in converting our Contract Revenue Backlog into revenue.*** Our results include growth in adjusted EBITDA, which reflects the scalability of our recurring revenue SaaS business model. Subsequent to the end of the third quarter, ***we closed the Artilium acquisition and have been busy integrating and streamlining the businesses and eliminating redundant expenses. We are continuing to grow our revenues, clearly seen in our results as we are driving financial performance and cash to the bottom line. Key performance indicators of Connections, Contract Revenue Backlog conversion***, Connection values, revenue-per-employee and churn continue to all move in the right direction and give us confidence in our overall strategy and business execution. Our TEUM remains laser focused on converting backlog to revenue, servicing our clients, selling into new geographical markets and creating shareholder value," said Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer.

(Emphases added.)

104.   On November 14, 2018, defendants Turner, O'Donnell, Bozzo, Thomas, Jimenez-Tuñon, and van Sante caused Pareteum to file its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2018 (the "3Q18 10-Q"), affirming the previously reported financial results.  The report was signed by defendants Turner and O'Donnell who also signed certifications pursuant to SOX attesting to the accuracy of the 3Q18 10-Q.

105.   Regarding controls over financial reporting, the 3Q18 10-Q stated that Pareteum's "disclosure controls and procedures are effective."  The report also stated, in relevant part:

Changes in Internal Control Over Financial Reporting

On January 1, 2018, the Company adopted ASC Topic 606, "Revenue from Contracts with Customers" and other than this change and related update to the

Company's internal controls, there have been no additional changes in the
Company's internal control over financial reporting that occurred during the
Company's fiscal quarter ended September 30, 2018 that has materially affected,
or is reasonably likely to materially affect, the Company's internal control over
financial reporting.

106.    Regarding compliance with GAAP, the 3Q18 10-Q stated:

The interim condensed consolidated financial statements have been prepared in
accordance with accounting principles generally accepted in the United States, or
GAAP, for interim financial information and with the instructions to Securities and
Exchange Commission, or SEC, Form 10-Q and Article 10 of SEC Regulation SX.
They do not include all the information and footnotes required by GAAP for
complete financial statements. Therefore, these financial statements should be read
in conjunction with our audited consolidated financial statements and notes thereto
for the year ended December 31, 2017, included in our 2017 Annual Report on
Form 10-K filed with the SEC on March 30, 2018, referred to as our 2017 Annual
Report.

The interim condensed consolidated financial statements included herein are
unaudited; however, they contain all normal recurring accruals and adjustments
that, in the opinion of management, are necessary to present fairly our results of
operations and financial position for the interim periods. The results of operations
for the three and nine months ended September 30, 2018 are not necessarily
indicative of the results to be expected for future quarters or the full year.

107.    On February 13, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon,

Lippert and van Sante caused Pareteum to announce that it had acquired iPass, Inc. in a stock

transaction valued at approximately $30 million.  In the press release, defendant Turner stated:

We're delighted to announce the completion of our acquisition of iPass. We will
now accelerate as one company with combined software products and services, the
expansion of addressable markets and the resulting executive and operating talent.
Our integration with iPass immediately grows our installed Connections base,
adding marquee brands to our portfolio of customers, and it also materially
enhances our software portfolio of services, and adds global access to the world's
largest Wi-Fi network.

108.    The next day, on February 14, 2019, defendants Turner, O'Donnell, Bozzo,

Jimenez-Tuñon, Lippert and van Sante caused Pareteum to announce six new three-year contracts,

"worth a total of $15 million."   The press release also stated: "Combined with previously

announced contracts, Pareteum's 36-month contractual revenue backlog now totals $615 million."

109.    That same day, on February 14, 2019, Iroquois Capital Management, LLC, which previously had owned over 3.57 million shares of Company stock, announced that it had liquidated all of its Pareteum holdings.  Upon this news, the price of the Company's stock increased from $3.19 per share at the close of trading on February 14, 2019, to $3.73 per share at the close of trading on February 15, 2019.

110.    On February 15, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused the Company to announce twelve new agreements that added $49 million to Pareteum's backlog.  The press release also stated:

> "Pareteum is experiencing great success with developers and enterprises for our cloud software solutions," said Rob Mumby Chief Revenue Officer. "With the addition of these new agreements, we're confident we will continue accelerating our growth as the market's first choice for cloud software communications solutions, expanding our ever growing reach, empowering businesses worldwide."
>
> Pareteum Executive Chairman and Principal Executive Officer Hal Turner commented, "We love our customers, whether they are simply buying more from us or are new customer relationships deriving value from the significant savings and new revenues we help them generate. These new January agreements reinforce how easy it is to do business with TEUM and is yet another step in our mission to connect every person and "every(thing)" through open mobility and applications everywhere."

111.    On February 20, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused Pareteum to announce six more agreements in a press release that stated:

> "*We continue to move signed customers from our contract backlog into production and revenue generation mode, delivering immediate value*," said Vic Bozzo, Chief Executive Officer of Pareteum.
>
> Pareteum Executive Chairman and Principal Executive Officer Hal Turner comments, "We are rapidly bringing our customers into service production, enabling them to realize their business plans, creating unique mobility and application software solutions. The ability to quickly accomplish all this, without heavy infrastructure or software development cost, keeps our customers coming back for more."

(Emphasis added.)

112.    On February 26, 2019, while the price of the Company's stock was trading approximately 25% higher than it had traded at the time of the iPass, Inc. acquisition, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused Pareteum to issue a press release announcing that the Company had entered into the Post Road Credit Facility.  The press release stated the following:

> Pareteum Executive Chairman and Principal Executive Officer Hal Turner commented, "*During 2018, we showed our ability to convert our contractual revenue backlog into tangible results. This financing gives us a new currency* with which to support our aggressive market consolidation through accretive acquisitions and organic growth strategy and improves leverage in the business to respect the value that management places on equity. The facility will allow us to continue on our current growth trajectory in 2019 and the future."

> The credit facility was led by Post Road Group and is a milestone transaction for Pareteum's mission to connect every person and every(thing)™. *The credit facility provides financing secured through Pareteum's existing recurring revenue streams from its software as a service platform*, as well as its growing intellectual property portfolio. *The transaction enables Pareteum to continue to demonstrate its ability to grow revenues on an organic as well as inorganic basis, globally.*

> Approximately $11 million of the initial draw will be used to repay the debt from Fortress Credit Corp. assumed in the iPass transaction. Remaining terms of the transaction are disclosed in Pareteum's regulatory filings.

(Emphases added.)

113.    On March 5, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused Pareteum to announce that "twenty new customers have executed 3-year contracts during February 2019, valued at $30 million in the [C]ompany's expanding 36-month contractual revenue backlog."

114.    On March 7, 2019, defendant Turner caused the Company to publish a letter to shareholders on its website, stating:

> Dear Fellow Shareholders,

In September 2018 I wrote a THANK YOU to you for your demonstrable support of Pareteum as you approved the Artilium acquisition. At that time, it was clear that you provided your support to us which in turn affirmed *our clear mandate to hyper-accelerate growth in accretive ways, be it through our continued stellar sales growth, or, through additional successful strategic alliances* which is how we began our Artilium acquisition. *We certainly expect to continue our market disruption, using our software to fuel our ambitions, business plans and strategies*.

\* \* \*

Looking forward, we are a company with ambitious plans for continued growth and profitability. On our upcoming earnings call, scheduled for March 12, 2019, you will hear about our 2018 successes that have laid a strong foundation as we set even more challenging 2019 goals. Our growth will continue from our current customers who continue to buy more from us. We will also see many new customers enter our client rosters, and because of our iPass acquisition, we have opened completely new market segments in the enterprise sector. *We fully expect to be the market leader in cloud based communications software as a service, as we execute on our business plan*.

\* \* \*

We have been updating you on our progress through our recent press releases, which we will continue to do. As we maintain our laser focus on growth, we measure ourselves by new customers joining us (36MCRB), service deployment (conversion of our 36MCRB), growth from our customer base with new product and services adoption, and clearly taking maximum advantage of our ability to make all of our services available to every customer, no matter if they were an iPass, Artilium, or Pareteum customer …now it is a One TEUM customer base. We expect material productivity enhancement to continue as we use our own software to scale our business. We consider internal communications with our TEUMATES, and with you as shareholders, to be a cornerstone of organization effectiveness.

*We are well positioned now to drive dramatic increases in our scale and become the recognized market leader through the value we create for our customers and shareholders*. We expect to continue to attract long-term institutional investors who believe in our proven ability to execute our plans and scale the company. Additionally, you will have read that we have improved our capital gain plans by the addition of a $50 million debt facility, initially being used to fully repay iPass' approximately $11 million debt on better terms, and *which puts us in a position to act immediately when accretive opportunities, that further improve Pareteum, are identified. We also believe that leveraging our business in this way demonstrates management's confidence in our business and equity value*.

As you have heard me say many times, ***"we are all in sales!" We are driving hard, everyday to acquire new customers, upsell our existing customers and aggressively convert our 36MCRB***.

(Emphasis added).

115.   On March 12, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused the Company to issue a press release announcing its fourth quarter and full year 2018 financial results.   According to the press release, Pareteum's 36-month contractual revenue backlog had quadrupled to $615 million for the full year.   Pareteum's press release stated, in relevant part:

"2018 was a record year for Pareteum, achieving over 139% year-over-year revenue growth driven by the effectiveness of our cloud-based platform, innovative product solutions, employee talent and leading customers. In fourth quarter of 2018, we reported 256% year-over-year revenue growth, which included the first full quarter of our accretive Artilium acquisition," commented Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer. "We are extremely pleased with Pareteum's significant results in 2018 which are attributed to our TEUM's laser focus on sales expansion and operational improvements. Looking ahead to 2019, we are very excited about the tremendous opportunities for Pareteum given the strong industry dynamics; our visibility into future revenue from our 36 Month Contractual Revenue Backlog; and, the augmented talent, product, services, network expansion and productivity improvements implicit from our strategic acquisitions."

**FOURTH QUARTER 2018 FINANCIAL RESULTS:**

**(Unless otherwise noted, all comparisons are made to the fourth quarter of 2017)**

- Total revenues increased 256% to $14.3 million

- In December of 2018 our Global Software Defined Cloud (GSDC) revenue was 51% of our total revenue, with 35% in Managed Services (MSP) revenues, and Super API of 14%

- Adjusted EBITDA increased 82% to $2.34 million

- Non-GAAP EPS of $0.02 cents

- Artilium financials are fully consolidated and accretive in Pareteum's fourth quarter results

- Net Dollar-based expansion rate represented 214% growth

**FULL YEAR 2018 FINANCIAL RESULTS:**

**(Unless otherwise noted, all comparisons are made to full year of 2017)**

- Revenues increased 139% to $32.4 million

- Adjusted EBITDA improved 199% year-over-year to $6.4 million

- Non-GAAP EPS of $0.09 cents compared to $0.05 cents for year ending 2017

- We ended the year with a $6.1 million cash balance and no secured debt

**KEY 2018 OPERATIONAL METRICS:**

- 36-month Contractual Revenue Backlog quadrupled to $615 million for the full year 2018, up from $147 million in 2017 with a conversion rate to revenue of 100%

- Connections increased 252% to 4,609,000 for the full year 2018, and grew 59% sequentially in the fourth quarter of 2018

- Fourth quarter average annualized revenue per employee of $415,000, an improvement of 78% year-over-year

* * *

**RECENT BUSINESS HIGHLIGHTS:**

- The Company completed the acquisition of Artilium in late September bringing several strategic advantages including an increased product offering; larger addressable market in Europe; expanded our executive, operational and sales talent; and enhanced our cloud platform with key operating support systems (OSS) and the internet of things (IOT) capabilities

- In February 2019, Pareteum completed the acquisition of iPass, delivering key strategic benefits including an intelligent Wi-Fi connectivity platform; deep relationships with marquis enterprise customers; strong process, procedures and systems; and strong talent particularly on the technology development side

- The Company closed a $50M credit facility with Post Road Group in February

- 2019. An initial draw of $25M will be used to repay the debt and transaction costs associated with the iPass transaction and to facilitate accelerated organic growth and potential M&A transactions

**2019 FULL YEAR GUIDANCE:**

We expect revenue to be between $105 million and $115 million for the full year of 2019. Adjusted EBITDA and Cash Flow, net of restructuring and acquisition costs will be positive for the year.

We are expecting 2019 revenue growth in the range of 225% to 260% year-over-year, outpacing the market growth rate fivefold to be updated quarterly.

(Emphasis in original).

116.    During a conference call held the same day in connection with the results, defendant

Turner stated:

Pareteum delivered excellent results in 2018 as well as in the fourth quarter of 2018. Pareteum's prospects are now the very best, more than ever before in our history. ***There is a clear path ahead for dramatic revenue growth and this is fueled by the growth of our 36 Month Contractual Revenue Backlog and its conversion of that backlog into billing customers.*** Artilium, which we acquired in October of 2018, has performed extraordinarily well. Bart, I want to thank you and all of our new Artilium teammates for that. Artilium was accretive to earnings and revenue just as we said that it would be. Well done, Bart and team.

Since our acquisition of iPass closed just a few weeks ago, many good things have happened. We've got newly -- new high experienced teammates joining with their extremely solid business acumen, their operating muscle, and importantly, we see that our new teammates are highly energized by the significantly expanded prospects that come with their being part of Pareteum.

* * *

For the remainder of 2019, we have a current robust pipeline of another 29 prospective sales transactions, and that's what's been identified just through mid-March. Pareteum's potential addition to our 36-month contractual revenue from these identified customers in our pipeline is currently $166 million.

(Emphasis added.)

117.    Notably, during the call, defendant Turner pointed out that defendant McCarthy

maintained the Company's backlog spreadsheets, stating, "Denis maintains our 36-month

contractual revenue backlog spreadsheets and analysis. So I'll turn to him for more detail on that. Denis?"

118.    During the same conference call, defendant McCarthy stated, in relevant part:

We generated $14.3 million of revenue in the fourth quarter and our gross margins were 63%, in line with expectations post the Artilium acquisition.

* * *

Our key performance indicators continue to exceed plans. Connections, which is our term for subscribers, devices and their connectivity usage, have grown over 4point -- to over 4.6 million at the end of the fourth quarter. 36 Month Contractual Revenue Backlog converted into live production incremental monthly revenue was at 97% of scheduled conversion for the fourth quarter while we're maintaining an average over 100% for the year.

* * *

Finally, as we mentioned during our last call, we are decidedly a growth company.

119.    On March 15, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused the Company to announce "ten new customers have executed three-year contracts during early March 2019, valued at $17 million in the company's expanding 36-month contractual revenue backlog."

120.    On March 18, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert, and van Sante caused the Company to file its annual report on Form 10-K with the SEC for the period ended December 31, 2018 (the "2018 10-K"), affirming the previously reported financial results.   Defendants Turner and O'Donnell signed certifications pursuant to SOX attesting to the accuracy of the 2018 10-K.

121.    Regarding revenue recognition, the 2018 10-K stated, in relevant part:

For the mobile solutions services the Company recognizes revenues from customers accessing our cloud-based application suite in two different service offerings, namely managed services and bundled services.

For managed services, revenues are recognized for network administration services provided to end users on behalf of Mobile Network Operators (MNO) and virtual Mobile Network Operators (MVNO's). Managed service revenues are recognized monthly based on an average number of end-users managed and calculated on a pre-determined service fee per user. For bundled services, the Company provides both network administration as well as mobile airtime management services. Revenues for bundled services are recognized monthly based on an average number of end-users managed and mobile air time and calculated based on a pre-determined service fee. Technical services that meet the criteria to be separated as a separate unit of accounting are recognized as the services are performed. Otherwise they are deferred and recognized over the contract term. Our arrangements with customers do not provide the customer with the right to take possession of the software supporting the cloud-based application service at any time.

Telecommunication revenues were recognized when delivery occurred based on a pre-determined rate and number of user minutes and number of calls that the Company has managed in a given month.

Professional services and other revenue include fees from consultation services to support the business process mapping, configuration, data migration, integration and training. Amounts that have been invoiced are recorded in accounts receivable and in net billings in excess of revenues or revenue, depending on whether the revenue recognition criteria have been met. Revenue for professional and consulting services in connection with an implementation or implantation of a new customer that is deemed not to have stand-alone value is recognized over the contractual period commencing when the subscription service is made available to the customer. Revenue from other professional services that provide added value such as new features or enhancements to the platform that are deemed to have standalone value to the customer or are sold separately from the original hosting arrangement, are deferred and revenue recognition occurs when the feature is activated.

The Company used revenue recognition standards for ASC 605 for the year ended December 31, 2017 and adopted the revenue recognition standards for ASC 606 beginning on January 1, 2018 using the modified retrospective transition method and applied these standards for the full year ended December 31, 2018.

122.    The 2018 10-K identified certain deficiencies in the Company's internal controls

over its financial reporting, stating:

Based on the foregoing evaluation, our management has identified the following deficiencies that constitute material weaknesses in the Company's internal controls over financial reporting:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment.

Ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

The material weakness did not result in any identified misstatements to the financial statements, and there were no changes to previously released financial results. Based on these material weaknesses, the Company's management concluded that at December 31, 2018, the Company's internal control over financial reporting was not effective.

123.    The 2018 10-K included an adverse audit report by Squar Milner LLP, Pareteum's independent accounting firm, which stated:

We have audited Pareteum Corporation's and its subsidiaries (the Company) internal control over financial reporting as of December 31, 2018, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013. *In our opinion, because of the effect of the material weaknesses described below on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2018*, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission in 2013 ("COSO").

\* \* \*

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following deficiencies in internal control have been identified as material weaknesses over the Company's control environment and monitoring pursuant to the COSO framework:

Inadequate and ineffective management assessment of internal control over financial reporting, including insufficient experienced resources to complete the documentation of internal control assessment and ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process.

These material weaknesses were considered in determining the nature, timing and extent of audit tests applied in our audit of the 2018 financial statements, and this report does not affect our report dated March 18, 2019.

(Emphasis added.)

124.    Despite the deficiencies in internal control over financial reporting, the 2018 10-K stated: "There have been no changes in our internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting."

125.    The 2018 10-K further purported that the Company had already begun taking measures to address the identified deficiencies in the Company's internal controls, stating the following:

> The remediation actions to the Company's internal controls over financial reporting include a thorough review and documentation of all processes involved in our financial reporting to ensure that there is segregation of duties, access security and documented review processes in place that happen at appropriate intervals throughout the year that covers all elements of the Company's financial reporting.
>
> This includes, but is not limited to, testing samples and documenting that testing has occurred with the results of the findings being reported to senior management and that they occur at appropriate intervals and continuously making improvements to our processes as necessary.
>
> * * *
>
> We believe that these actions will remediate the material weakness. The weakness will not be considered remediated, however, until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. We expect that the remediation of this material weakness will be completed prior to the end of fiscal 2019.

126.    The above statements in ¶¶ 90-94, 96-108, 110-125 were materially misleading because they failed to disclose: (1) that the Company was unlikely to collect revenue from certain customer transactions; (2) that, as a result, Pareteum had improperly recognized revenue derived from these transaction; (3) that, as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) that, as a result, the Company's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (5) that the Company was reasonably likely to restate certain financial statements; and (6) that certain of the Company's officers and directors,

including defendants Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct.

127.   Moreover, one of the 2018 10-K's risk disclosures concerned the Post Road Credit Facility the Company had secured on February 26, 2019, and stated the following:

> We have outstanding debt secured by all of the assets of the Company, including our intellectual property, and failure by us to fulfill our obligations under the applicable loan transaction agreements may cause the repayment obligations to accelerate.
>
> In February 2019, we, and certain of our subsidiaries, entered into a credit agreement (the "Credit Agreement") with Post Road Administrative Finance, LLC and its affiliate Post Road Special Opportunity Fund I LLP (collectively, "Post Road"), pursuant to which Post Road will provide the Company with a secured loan of up to $50,000,000 (the "Loan") with an initial loan of $25,000,000 funded on February 26, 2019, and additional loans in increments of $5,000,000 as requested by the Company before the 18 month anniversary of the initial funding date: ***provided however that no additional loans shall be funded until the later of delivery of certain third party consents (the "Consents")***. The Credit Agreement provides for all amounts due on February 26, 2022 and requires us to meet and maintain within specified levels and thresholds with respect to financial and operational covenants, including: requirements to maintain a minimum of $2,000,000 of unrestricted cash, certain maximum total leverage rations, a debt-to-asset ratio, maximum churn rate and adjusted EBITDA. The Credit Agreement further provides customary events of default and cure periods for certain specified events of default, and in the event of uncured default, the acceleration of the maturity date, an increase in the applicable interest rate with respect to amounts outstanding under the Loan and payment of additional fees. The Credit Agreement also provides for an increase in the interest rate upon failure to timely deliver Consents by May 31, 2019 or July 31, 2019, as applicable. ***There can be no assurance that we will be able to perform and timely repay the amounts outstanding under the Credit Agreement, and upon the occurrence of an event of default under the Credit Agreement, if we are not able to repay all outstanding amounts required, we would lose control over our assets, including our intellectual property, which would seriously harm our business and operations.***

(Emphasis added).

128.   The above statement was materially misleading because it failed to disclose: (1) that the Company had already failed to perform and timely repay the amounts due to Post Road

Group; (2) that the Company had been unable to deliver the third party consents required under its agreement with Post Road Group to receive additional loans subsequent to the initial loan of $25 million; and (3) that the Company was already in breach of its agreement with Post Road Group by failing to timely provide financial reports to Post Road Group.

129.    On March 28, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused the Company to announce that it had engaged a new customer and that "[t]he initial phase of the contract is valued in excess of $50 million, which is incremental to Pareteum's 36-month contractual revenue backlog."

130.    On April 4, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused the Company to announce that "new contracts closed during the second half of March 2019 contributed in excess of $80 million to the company's expanding 36-month contractual revenue backlog."

131.    On May 7, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused the Company to announce its first quarter 2019 financial results in a press release that stated, in relevant part:

> "We are very pleased with our strong first quarter results, delivering 460% revenue growth in Q1 2019 compared to Q1 2018. Pareteum's core business, pre-acquisitions, has grown 33% over the prior quarter," commented Hal Turner, Pareteum's Founder, Executive Chairman and Principal Executive Officer. "We are proud of the significant business transformation we have achieved over the past few years. Pareteum is a fast-growing and profitable SaaS and communications service provider. Our software and platform solutions are unique in the market, our global TEUM is executing, we are well positioned to capture the large market opportunity, and we are committed to our mission to *connect every person and every(thing)*™."
>
> **FIRST QUARTER 2019 FINANCIAL RESULTS:**
> **(Unless otherwise noted, all comparisons are made to the first quarter of 2018)**
>
> • Total revenues increased 460% to $23 million
>
> • Adjusted EBITDA increased 1,723% to $5.2 million

- Non-GAAP EPS of $0.02 cents

- Artilium and iPass financials are consolidated and accretive in Pareteum's first quarter results

- Net Dollar-based expansion rate represented 144% growth

- Increase in total assets from $27.2 million at March 31, 2018 to $236.9 million at March 31, 2019

- Cash balance of $10.7 million

**KEY FIRST QUARTER OF 2019 OPERATIONAL METRICS:**

- 36-Month Contractual Revenue Backlog increased to $938 million for the first quarter of 2019, up from $200 million in the first quarter of 2018 with a conversion rate to revenue of 101%

- Connections increased 441% to 12,012,000 for the first quarter of 2019, and grew 161% sequentially in the first quarter of 2019

- First quarter average annualized revenue per employee of $390,000, an increase of 55% year over year

132.    During a conference call held the same day in connection with the results,

defendants Turner stated, in relevant part:

Now to our business at hand. ***Pareteum is performing extremely well***. Without taking too much of Denis's thunder from his results review coming shortly. ***We reported a 460% Q1 2019 over Q1 2018 revenue increase***, more from Denis on that shortly. ***However we are on target with our products delivered, those being developed, our markets served and those that we will expand to***. Our customers who are onboarding now even more efficiently and our people, matching the very best resources to address every opportunity we have. In every sense, this Company has reimagined the future of communications and we're delivering on it today.

Our mission of connecting every person and everything is also on track. We're on plan financially and we're well above our expectations and sales results. We're raising the quality of customer experiences everyday and we're raising our results and performance expectations with operational transparency. ***As a growth Company, we're expanding in a financially responsible manner.***

133.    With respect to the Company's backlog, defendant Turner stated the following:

***To complete the 36-month contract revenue backlog topic, the most important phase for Pareteum is to convert these contracts to billable revenues***. This means new sales orders placed into live production, based upon their contracted schedules

for service, invoices rendered, being billed and revenues collected. Our backlog conversion metrics show this story and we're doing very well in this regard.

I'd like to share a couple of details with you. From the inception of tracking the services deployed during the period of January the 1st, 2017 through March the 31st of 2019, that's a 27-month period, we converted revenues in the backlog as they were scheduled at 101%. *We converted connections which is our word for subscribers at 122%.* This means that taking each contract and comparing what was contractually scheduled by the customers. In both the revenue and connections, *we've over retained and outperformed what had been expected*. We're very pleased with this growth performance. But I must tell you we're even more pleased with what I'm about to say to you.

134.    The above statements in ¶¶ 129-133 were materially misleading because they failed to disclose: (1) that the Company was unlikely to collect revenue from certain customer transactions; (2) that, as a result, Pareteum had improperly recognized revenue derived from these transaction; (3) that, as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) that, as a result, the Company's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (5) that the Company was reasonably likely to restate certain financial statements; and (6) that certain of the Company's officers and directors, including defendants Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct.

135.    Also during the call, defendant McCarthy stated, in relevant part:

*We have achieved organic growth of 32% over the prior-quarter from the combined Pareteum and our Artilium business* . . .

* * *

As discussed on our year-end call, we established a new $50 million credit facility with Post Road Group and retired the more expensive debts acquired in the iPass acquisition. *The facility also provides us with significant available liquidity going forward should we need it.*

*While we currently have no plans for the additional capital to operate our business, it gives us additional security and flexibility*. I want to reinforce Hal's

comments about the remarkable transformation that Pareteum has achieved, along with this rapid growth and transformation, ***we have experienced some challenges including those related to our internal controls, primarily as a result of M&A integration.***

(Emphasis added).

136.    The above statement was materially misleading because it failed to disclose: (1) that the Company had already failed to perform and timely repay the amounts due to Post Road Group; (2) that the Company had been unable to deliver the third party consents required under its agreement with Post Road Group to receive additional loans subsequent to the initial loan of $25 million; and (3) that the Company was already in breach of its agreement with Post Road Group by failing to timely provide financial reports to Post Road Group.

137.    On May 10, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended March 31, 2019 (the "1Q19 10-Q"), affirming the previously reported financial results.  The report was signed by defendants Turner and O'Donnell, who also signed certifications pursuant to SOX attesting to the accuracy of the 1Q19 10-Q.

138.    The 1Q19 10-Q stated that "due [to] a previously reported material weakness in our internal control over financial reporting described below, the Company's disclosure controls and procedures were not effective as of March 31, 2019."  The report further stated:

> To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) has continued to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) instituted sample testing of changes made in our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhanced our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors. Management believes this material weakness has been remediated, as of March 31, 2019, pending further testing.

We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of March 31, 2019, these efforts are ongoing.

We are committed to maintaining a strong internal control environment and believe that these remediation actions will represent significant improvements in our controls. However, the identified material weakness in internal control over financial reporting will not be considered remediated until controls have been designed and/or controls are in operation for a sufficient period of time for our management to conclude that the material weaknesses have been remediated. Additional remediation measures may be required, which may require additional implementation time. We will continue to assess the effectiveness of our remediation efforts in connection with our evaluations of internal control over financial reporting.

139.   Regarding compliance with GAAP, the 1Q19 10-Q stated the following:

The interim condensed consolidated financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("GAAP,") for interim financial information and in accordance with the instructions to Securities and Exchange Commission ("SEC"), Form 10-Q and Article 8 of SEC Regulation SX. They do not include all the information and footnotes required by GAAP for complete financial statements. Therefore, these financial statements should be read in conjunction with our audited consolidated financial statements and notes thereto for the year ended December 31, 2018, included in our 2018 Annual Report on Form 10K filed with the SEC on March 18, 2019, referred to as our 2018 Annual Report.

The interim condensed consolidated financial statements included herein are unaudited; however, they contain all normal recurring accruals and adjustments that, in the opinion of management, are necessary to present fairly our results of operations and financial position for the interim periods. The results of operations for the three months ended March 31, 2019, are not necessarily indicative of the results to be expected for future quarters or the full year. All intercompany transactions and account balances have been eliminated in consolidation. . . .

140.   On May 15, 2019, defendants Turner, O'Donnell, Bozzo, Jimenez-Tuñon, Lippert and van Sante caused the Company to announce that it had "closed more than 20 new sales transactions in April 2019, with a combined contract value of $70 million."

141.   On May 28, 2019, the Company held an invite-only analyst and investor day to provide updates on product offerings and growth strategies.  During a presentation at the event, the Company touted its partners and customers:



142.    The above statements in ¶¶ 137-141 were materially misleading because they failed to disclose: (1) that the Company was unlikely to collect revenue from certain customer transactions; (2) that, as a result, Pareteum had improperly recognized revenue derived from these transaction; (3) that, as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) that, as a result, the Company's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (5) that the Company was reasonably likely to restate certain financial statements; and (6) that certain of the Company's officers and directors, including defendants Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct.

143.    On June 6, 2019, defendants Turner, Jimenez-Tuñon, Lippert, and van Sante issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting to be held on July 17, 2019. In the 2019 proxy statement, these four Individual Defendants solicited stockholder votes in favor of two management proposals, including a proposal to elect Turner, Jimenez-Tuñon, Lippert, and van Sante to new terms as directors.

144.     The 2019 proxy statement disclosed that the Board had determined that Turner was not an independent director. Regarding corporate governance, the proxy statement was substantially similar to the 2018 proxy statement, as identified in ¶ 84.

145.     With respect to the Company's Code of Conduct, the 2019 proxy statement stated, "[t]he code of conduct applies to all employees, as well as each member of our Board of Directors. All employees are required to read the code of conduct and affirm in writing their acceptance of the code."

146.     The 2019 proxy statement was materially misleading because it failed to disclose: (1) that the Company was unlikely to collect revenue from certain customer transactions; (2) that, as a result, Pareteum had improperly recognized revenue derived from these transaction; (3) that, as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) that, as a result, the Company's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (5) that the Company was reasonably likely to restate certain financial statements; (6) that certain of the Company's officers and directors, including defendants Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct; and (7) that it misrepresented the Board's actual activities with respect to financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties.

### B.     The Truth Begins to Emerge as the False and Misleading Statements Continue

147.     On June 7, 2019, Marcus Aurelius Value published a report alleging accounting irregularities in the Company's financial statements and scrutinizing its abnormally large backlog. The report stated, among other things:

<u>TEUM's Purported $900 Million Backlog Appears Significantly Exaggerated or Fictitious.</u>

The foundation of the Pareteum growth story is built on the company's supposedly large and fast-growing 36-month backlog, which management now says exceeds $900 million. But our investigation identified a variety of purportedly valuable customers that appear wholly incapable of paying TEUM anywhere near the large contractual values that TEUM has touted. Examples include:

- A nearly-worthless penny-stock managed by a former AudioEye executive named alongside TEUM's CFO in the fraud suit.

- African entities that show no signs of meaningful business activity.

- Contracts with crypto-companies including one that recently settled with the SEC and "agreed to return funds to harmed investors."

- Closed or dissolved businesses.

- Websites that are inactive or offer limited contact information.

- Businesses that don't answer the phones or report having minimal employees.

- European entities with tiny amounts of capital or revenue.

- Featured customers located in apartment buildings.

- Millions in loans to an entity bleeding cash.

- A purported $50 million contract with an entity in Thailand that reports having zero 2018 revenue, years of losses, and involvement with a crypto-coin that has lost 97% of its peak value.

We also found irregularities and embellishments involving a significant portion of the "notable partners and customers" that TEUM highlighted in a graphic at its recent analyst day, suggesting TEUM struggles to find enough legitimate new customers to even fill a simple slide.

<u>TEUM's Backlog Conversion and Receivables Signal Serious Potential Accounting Problems.</u>

The accounting fraud that TEUM's CFO allegedly perpetrated at AudioEye involved the booking of phantom revenues to artificially inflate the stock price. Bulls have taken comfort in management's assurances that TEUM's backlog has converted to revenue at over 100% of contractual rates thus far. But we find TEUM's backlog conversion rate highly problematic considering that our research has flagged so many small or defunct customers. If exaggerated contractual values

are now being recognized as revenue, then we believe TEUM will face serious accounting problems. TEUM's receivables have already begun to balloon after growing at sequential rates far faster than revenues in each of the last four quarters. TEUM's small California auditor, which was specifically cited by the PCAOB for audit deficiencies related to revenue, gives us no comfort.

This is exactly why we're troubled that TEUM's receivables have grown at sequential rates far faster than revenues in each of the last four quarters. For example, revenues grew 64% to $23M in Q1 2019 from $14M in Q4 2018 but receivables ballooned 86% to $28M from $15M over the same period. This is puzzling because TEUM's own SEC filings state that "the company typically bills its customers at the end of each month, with payment to be received shortly thereafter", which we believe should naturally result in relatively minimal receivables. But TEUM's Days Sales Outstanding has reached 110 days as compared 39 days of Twilio (TWLO), a company that promoters like to compare TEUM to, suggesting that TEUM's customers may already be falling behind on their bills.

TEUM's small California auditor, Squar Milner, gives us no additional comfort. Squar has audited at least one company owned by Barry Honig, True Drinks Holdings (TRUU), an equity that is now virtually worthless. More importantly, the Public Company Accounting Oversight Board ("PCAOB") uncovered significant deficiencies in its most recent inspection of Squar in 2017. The PCAOB stated in its report that "in other words, in these audits, the auditor [Squar] issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement." The PCAOB even identified two significant deficiencies in a Squar audit specifically related to the valuation of revenue . . .

148.    According to the Marcus Aurelius Report, one of Pareteum's purported customers

was merely a shack:

TEUM's public claims simply don't hold up to investigative scrutiny. For example, TEUM touted a contract with the South Africa based "Eyethu Mobile Network" as part of a group of deals, purportedly worth $50 million in aggregate, that TEUM says it signed in the last two weeks of August 2018. . . . Our investigators went to visit Eyethu/EMN's headquarters but discovered only a dilapidated shack and crumbling structures near a rural African village . . .

Documents and detailed forensic evidence presented throughout this report shows that Eyethu is only the tip of the iceberg of small or defunct entities across the world that TEUM claims to have signed valuable contracts with.

149.    Moreover, the Marcus Aurelius Report detailed numerous ties between the Company's management, including certain of the Individual Defendants, and various failed stock promotions and other schemes, stating the following:

<u>TEUM's Management Has Extensive Ties to Previous Alleged Frauds and Failures.</u>

The biographies for Turner and TEUM's COO fail to disclose their leadership positions at Catcher Holdings, a now worthless stock that was owned by a group that included an entity controlled by Barry Honig, the notorious stock operator charged by the SEC last October with fraud for alleged pump and dump schemes. We see similarities between TEUM and the stock promotion at Catcher, where Turner repeatedly touted Catcher's technology and growth prospects but investors ultimately were left with nothing. TEUM's CFO was sued by investors for fraud after he allegedly "*personally affected the fraudulent booking of revenues*" as CFO of Audioeye, which later erased *92%* of reported revenues over the relevant period in a restatement. TEUM's former Audit Committee Chair, now a TEUM executive, was the CFO of TowerStream, another Honig-backed company that is now nearly worthless. TEUM's longtime investor relations representative was previously sentenced to prison in 2015 and recently disappeared from press releases after being added to a list of prohibited service providers by OTC markets

* * *

While Chairing TEUM's Audit Committee, Laura Thomas was also the CFO of TowerStream, a nearly worthless equity owned by Honig. Thomas moved from the TEUM Board to an executive role at TEUM in December 2018 and resigned from TowerStream in January 2018.

TEUM's longtime investor relations representative was Stephan Hart (aka Steven or Stephen Hart) who disappeared from TEUM press releases earlier this year after being added to the list of prohibited service providers by OTC markets. Hart was representing TEUM even though he was sentenced to prison in August 2015 for obstruction of justice and perjury following charges by the SEC for "illegal trading schemes" in December 2012.

* * *

<u>TEUM Has Surrounded Itself with Veterans from Failed Stock Promotions.</u>

We discovered a network of actors behind TEUM whose mere presence should send diligent investors running for hills. TEUM has paid promoters, used a placement agent, and attracted large investors that are veterans of numerous previous stock promotions Honig was an investor in, many of which have since declined to near worthlessness. We discovered that TEUM's relationship with Honig's longtime securities law firm, Sichenzia Ross, is so close that the address

that TEUM's lists on its website as its "USA Headquarters" is actually Sichenzia's main office. TEUM has issued tens of millions in shares, warrants, and convertible preferred securities in a series of complex private placements with the assistance of Sichenzia, who is being sued by a former client for allegedly helping create "ownership blockers" for Honig's group as part of an alleged pump and dump scheme that left that company bankrupt and unable to even validate its number of shares outstanding (Sichenzia and Honig deny the allegations)

\* \* \*

TEUM uses the same placement agent as Mabvax [Theraputics] did, a Boca Raton broker named Dawson James Securities that also now issues favorable research reports on TEUM. According to our analysis, Dawson James has been engaged by 13 different companies that have been owned by Honig, most of which have declined more than 75% from their peak value and/or are now virtually worthless.

\* \* \*

While we are unable to identify all of TEUM's private placement investors, two firms that have regularly invested alongside Honig, Iroquois Capital and IntraCoastal Capital, owned or controlled 13.2% of TEUM's outstanding shares as of March 2018, according to an SEC filing. By our count, Iroquois and/or Intracoastal have collectively invested in a total of 34 publicly traded companies that were also owned by Honig, most of which have either declined more than 75% from their peak value or are now virtually worthless. A February 2019 SEC filing reported that Iroquois Capital has already dumped their entire TEUM stake. We note that Iroquois reportedly received an SEC subpoena as part of the investigation into Honig's alleged pump and dump ring but was not named in the SEC complaint or been accused of wrongdoing.

TEUM has paid stock promoters from Red Chip companies, which has previously touted numerous now worthless companies backed by Honig. . . .

150.    On this news, the Company's shares fell $0.83 per share, or over 24%, to close at

$2.58 per share on June 7, 2019, on unusually heavy trading volume.

151.    On June 10, 2019, Insider Monkey published Pareteum's response to the report:

Dear Fellow Pareteum Shareholders,

I want to take a moment to thank all of you for your support as we drive Pareteum forward.

In recent days our share price has been negatively impacted *by a coordinated attack by short sellers.* We fully understand that short selling is legal and it is an important part of the capital markets. That said, certain short sellers have used questionable

tactics, including leveraging the media to misrepresent facts and make anonymous spurious claims against the company and its officers.

***Every one of us at Pareteum is fully dedicated to upholding the highest standards and reporting requirements of a public company. We categorically deny the allegations put forth.*** We do not intend to legitimize those reports by delving in to them.

Pareteum has experienced tremendous growth, and we continue to grow in a healthy and measurable way. We are confident in our strategy and mission – to connect every person and every(thing)™. Today millions of people and devices around the world are connected using Pareteum's Global Cloud Communications Platform, enhancing their mobile experience. Every day more people and devices are being added to our platform.

We will not be distracted. We continue to focus on operating our business and generating strong financial results. We believe executing on this plan will ultimately create significant value for long term shareholders.

We will report our Q2 results in early August, and look forward to speaking with you then.

Again, I want to thank all of our shareholders for their continued support.

Sincerely,

Hal Turner

Chairman and Chief Executive Officer

(Emphases added.)

152.    On June 25, 2019, Viceroy Research Group published a report which further scrutinized Pareteum's accounting practices. The report summarized its findings, in relevant part:

- Further to recent research reports, Pareteum has a history of promotional press releases of customer wins. A deeper investigation into these customers show much larger number are insignificant, and the companies behind them appear in no way capable of fulfilling the contract values advertised by Pareteum.

- Two of Pareteum's customer wins appear to be undisclosed related parties tied to Pareteum consultant Dinesh "Danny" Patel.

- One of Pareteum's announced customer wins is a company under a historic investigation and charged with significant VAT evasion fraud. Information

on this is easily available, leading us to believe that Pareteum was aware of the company's issues while announcing the customer win.

- Pareteum appears to be in breach of US sanctions against Iran through its provision of services to Iranian MVNO Amin SMC. Amin SMC appears to be chaired by Hamid Reza Amirinia, an individual suspected of breaching sanctions with an Iranian government mandate to launder money for the regime

\* \* \*

- Several entities on the pareteum.cloud domain are small companies or have no web presence whatsoever, leading us to believe that they are Pareteum customers who are unable to pay or have no operations.

- Pareteum's 36-month contractual backlog measurement is not an accurate predictor of future profits. An analysis of the company's backlog and management comments shows it should have reported 73.10% more revenue in Q1 2019 than it did. Management appears to be inflating this figure to hype up the share price and reassure investors.

\* \* \*

- Pareteum's management has a history of dishonest reporting. Notably, CFO Ted O'Donnell who was sued by former employer AudioEye for fabricating US$8.1m worth of revenue over 3 quarters which was found to have no supporting documentation. This was an overstatement of revenues in the period of more than 3,000%.

- Pareteum's rapid-fire announcement of customer wins mirrors its announcements regarding cryptocurrency in 2017, which were put to an abrupt halt when a response to an SEC letter revealed TEUM had made no revenue, nor planned to do so, from cryptocurrency.

\* \* \*

- A breakdown of Pareteum's revenues, cash flows and receivables show the majority of its revenue from sources other than Vodafone and acquired businesses iPass and Artilium appears to be uncollectable. Accordingly, we believe total revenue is overstated by 42%, corroborating our findings regarding Pareteum's customers.

153.    The Viceroy Report specifically discussed the revenue figures reported in

Pareteum's financial statements as follows:

Pareteum has 4 months accounts receivable sitting on its balance sheet. When combined with the drastic increase in receivable days since the end of 2017, it appears that Pareteum's new customers are not paying their bills. Despite this Pareteum's management continues to recognize this apparent uncollectable revenue from customers.

* * *

- Pareteum's acquired businesses iPass and Artilium are getting paid on "typical" billing terms of 30 days, per management assertion. It is noteworthy that *this is not strictly true*:

  o Artilium's last publicly available financials show **77.473 receivable days** and claim that the average credit period on sales to be **87 days** as of June 30, 2018.

  o iPass's Q3 2018 10-Q revenue and receivables figures show **78.155 receivable days** with standard credit terms of **30 days.**

- iPass' purchase price accounting allocated US$4.344m in accounts receivable to Pareteum's balance sheet.

- Artilium's purchase price accounting allocated a negligible amount of accounts receivable to Pareteum's balance sheet: it appears Pareteum wrote a significant balance off. We have not accounted for this negligible balance.

According to our model Pareteum has collected only 4% of the revenue recognized from these customers in the 12 months trailing Q1 2019. While this figure is probably lower than Pretium's actual collections, it creates a Catch-22 situation where receivables from Artilium and iPass are also growing exponentially.

(Emphasis in original).

154.    On this news, the Company's share price fell $0.51, or over 20%, to close at $2.00

per share on June 26, 2019, on unusually heavy trading volume.

155.    On July 18, 2019, the Company filed with the SEC a Form 8-K disclosing the

results from the votes on the proposals contained in the 2019 proxy statement.  In particular,

Turner, Jimenez-Tuñon, Lippert, and van Sante were reelected to terms as directors.

156.    On August 6, 2019, defendants Turner, O'Donnell, Jimenez-Tuñon, Lippert and

van Sante caused the Company to announce its second quarter 2019 financial results in a press

release. Unlike prior earnings announcements, this press release did not mention Pareteum's backlog. Instead, the Company's press release stated, in relevant part:

### SECOND-QUARTER 2019 FINANCIAL RESULTS YEAR-OVER-YEAR:

- Total revenue increased 469% to $34.1 million

- Income from Operations totaled $159,000

- EBITDA increased 466% to $3.4 million

- Adjusted EBITDA increased 369% to $6.1 million

- Non-GAAP EPS of $0.03 (Non-GAAP EPS of $0.05 for the 6 months ending June 30, 2019)

- Net Dollar-based expansion rate represented 151% growth

- Increase in total assets from $33.1 million at June 30, 2018 to $246.9 million at June 30, 2019

* * *

### KEY SECOND-QUARTER OPERATIONAL METRICS:

- Connections increased 380% to 13,030,000 for the second quarter of 2019, and grew 108.5% sequentially for the first half of 2019

- Second-quarter average annualized revenue per employee of $583,000, an increase of 55% year-over-year

157. On August 9, 2019, defendants Turner, O'Donnell, Jimenez-Tuñon, Lippert and van Sante caused the Company to file its quarterly report on Form 10-Q with the SEC for the period ended June 30, 2019 (the "2Q19 10-Q"), affirming the previously reported financial results. The report was signed by defendants Turner and O'Donnell, who also signed certifications pursuant to SOX attesting to the accuracy of the report.

158. Regarding efforts to remediate the previously disclosed material weakness, the 2Q19 10-Q stated, in relevant part:

To address ineffective design, implementation and monitoring of information technology general controls pertaining to the Company's change management process, the Company has (i) removed all live access to all developers, internal and external, from being able to make coding changes directly in our reporting system; (ii) has continued to monitor and document all changes made in our reporting system and add additional layers of documented review of these changes; (iii) instituted monitoring controls and sample testing needs to be completed on our reporting system to ensure the documented policies are being followed and report the results of these tests to senior management in regular appropriate intervals; and (iv) enhanced our quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors. Management believes the Company has taken significant steps towards the remediation of the identified material weaknesses, as of June 30, 2019.

We also continue to develop certain remediation steps to address the material weakness discussed above to improve our assessment of internal control over financial reporting. As of June 30, 2019, these efforts are ongoing.

We are committed to maintaining a strong internal control environment and believe that these remediation actions will represent significant improvements in our controls. However, the identified material weakness in internal control over financial reporting will not be considered remediated until controls have been designed and/or controls are in operation for a sufficient period of time for our management to conclude that the material weaknesses have been remediated. Additional remediation measures may be required, which may require additional implementation time. We will continue to assess the effectiveness of our remediation efforts in connection with our evaluations of internal control over financial reporting.

159.    The above statements in ¶¶ 151, 156-158 were materially misleading because they failed to disclose: (1) that the Company was unlikely to collect revenue from certain customer transactions; (2) that, as a result, Pareteum had improperly recognized revenue derived from these transaction; (3) that, as a result, Pareteum's revenue backlog and accounts receivable were overstated; (4) that, as a result, the Company's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (5) that the Company was reasonably likely to restate certain financial statements; and (6) that certain of the Company's officers and directors, including defendants Turner and O'Donnell, had ties to various failed stock promotions and

schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct.

160.    On August 23, 2019, defendants Turner, O'Donnell, Jimenez-Tuñon, Lippert and van Sante caused the Company to file a Form 8-K with the SEC, which included as an exhibit a "Waiver and First Amendment to Credit Agreement" (the "Waiver") in connection with the Post Road Credit Facility.  The Waiver constituted an agreement between Post Road Group and the Company to waive the Company's default under the Post Road Credit Facility, and stated the following:

> This WAIVER AND FIRST AMENDMENT TO CREDIT AGREEMENT dated as of August 22, 2019 (this "Amendment") is by and among PARETEUM CORPORATION, a Delaware corporation (the "Borrower"), the guarantors party hereto (the "Guarantors" and together with the Borrower, each a "Credit Party" and, collectively, the "Credit Parties"), the lenders party hereto (each a "Lender" and, collectively, the "Lenders"), POST ROAD ADMINISTRATIVE LLC, a Delaware limited liability company ("Post Road"), as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent") and Post Road, as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent", and together with the Administrative Agent, collectively, the "Agents" and each an "Agent"), and relates to that certain Credit Agreement dated as of February 26, 2019, by and among the Borrower, the Credit Parties party thereto, the Lenders party thereto and the Agent (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement").
>
> WHEREAS, the Borrower has requested that the Administrative Agent (a) waive the breaches of certain obligations and covenants under the Credit Agreement as set forth in greater detail on Annex A attached hereto for the periods specified therein, as applicable (collectively, the "Subject Obligations and Covenants" and (b) amend the Credit Agreement as set forth herein; and
>
> WHEREAS, the Administrative Agent is willing to acquiesce to the Borrower's request, subject to the terms and conditions outlined in this Amendment.

161.    The Waiver also revealed the Company's obligations under the Post Road Credit Facility:

> 1.  To comply with the requirements set forth in the definition of "Permitted Acquisition" in connection with the consummation of the DeviceScape

Acquisition as required by clause (m) of Section 9.05 of the Credit Agreement.

2. To timely make the interest payment owed to the Administrative Agent for the Period that ended on or about March 31, 2019, as required by Section 2.09(b) of the Credit Agreement.

3. To timely deliver (i) the financial reporting information for the fiscal month ending February 28, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

4. To timely deliver (i) the financial reporting information for the fiscal month ending March 31, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

5. To timely deliver (i) the financial reporting information for the fiscal quarter ending March 31, 2019 as required by Section 8.01(b) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

6. To timely deliver (i) the financial reporting information for the fiscal month ending April 30, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

7. To timely deliver (i) the financial reporting information for the fiscal month ending May 31, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

8. To timely deliver (i) the financial reporting information for the fiscal month ending June 30, 2019 as required by Section 8.01(a) of the Credit Agreement and (ii) the corresponding Compliance Certificate for such period as required by Section 8.01(d) of the Credit Agreement.

9. To timely deliver the [***] Consent and Acknowledgment as required by Section 8.17 of the Credit Agreement.

10. To timely deliver the [***] Consent and Acknowledgment as required by Section 8.17 of the Credit Agreement.

11. To comply with Sections 8.10 and 8.11 of the Credit Agreement in connection with the formation of its wholly-owned subsidiary DeviceScape Holdings, Inc., a Delaware corporation, and its acquisition of certain assets from DeviceScape Software, Inc., a California corporation, on or about April 22, 2019.

162.    To obtain this waiver and a $2.5 million loan from Post Road Group, Pareteum

agreed to issue 750,000 shares of Company stock to Post Road Group on August 22, 2019 and

250,000 shares on November 15, 2019, thereby diluting existing shares of Company stock.

163.    On this news, the Company's shares fell $0.29, or nearly 11%, to close at $2.47 per

share on August 23, 2019, on unusually heavy trading volume.

164.    On August 27, 2019, Seeking Alpha published a report[3] titled, "Pareteum – Caught

in a Cash Crunch After Violating Debt Covenants," which commented on the Post Road Credit

Facility and Pareteum's revenue, stating in relevant part:

> Shares of controversial emerging Communications Platform as a Service
> ("CPaaS") provider Pareteum Corporation have remained under pressure in recent
> weeks after the company's Q2/2019 results on August 6 revealed two major issues:
>
> 1. ***Accounts receivable ballooned an eye-catching 57% quarter-over-
>    quarter***, even outpacing the 48% sequential revenue increase. ***Over the past
>    six months, accounts receivable have almost tripled from $15.4 million at
>    year end 2018 to $45.1 million at the end of Q2.***
>
> 2. Free cash flow for the quarter was negative $8 million, leaving the company
>    with just $3.4 million in unrestricted cash at the end of Q2, ***dangerously
>    close to the $2 million minimum liquidity covenant defined in its up to $50
>    million senior secured credit facility with Post Road Group***, a Connecticut-
>    based junior private investment firm. For the first half of FY2019, Pareteum
>    used $16.7 million in operating and investing activities.
>
> On the conference call, ***management actually pointed to accounts receivable to
> increase even further during Q3 with collections starting to come through in Q4***.

(Emphasis added).

165.    The report also cautioned investors about the Company's financial stability, and

predicted that the Company would likely need to implement a secondary offering at some point in

the future in order to remain solvent, stating the following:

---

[3] https://seekingalpha.com/article/4288112-pareteum-caught-in-cash-crunch-after-violating-debt-covenants

Personally, I do neither expect the company to return to covenant compliance in due time nor the accounts receivable issue starting to resolve itself by next quarter. ***Accordingly, investors might have to prepare for a large, secondary offering in the not too distant future.***

Should the company not start to collect on its accounts receivable in due time, ***Pareteum will likely lose its ability to access the capital markets with bankruptcy being the ultimate outcome in this case.***

***Given the recent, negative developments and the company's increasingly uncertain outlook, investors should continue to avoid the shares or sell existing positions.***

\* \* \*

At this point, the company might still be able to sell additional equity but given the requirement to raise at least $35-$40 million to repay the [C]redit [F]acility including considerable exit fees and bridge the gap to anticipated cash collections in Q4 would likely cause the stock to tumble well below the $2 mark, particularly if investors require Pareteum to issue warrant sweeteners or even enter into a toxic financing transaction.

***Frankly speaking, things are really starting to look ugly for Pareteum***. ***The company has been in breach of debt covenants basically right from the closing date of the credit agreement with Post Road Group in February and seems now caught in a severe cash crunch.***

\* \* \*

As of this point, it seems that the skeptics have been right on Pareteum as the company is obviously experiencing a cash crunch with the lender only reluctantly providing additional liquidity to keep the company afloat for now.

Should Pareteum again fail to comply with the covenants and obligations under the amended credit agreement, ***Post Road Group might very well chose to issue a notice of default, requiring the company to repay the almost $28 million currently outstanding under the facility within short notice.***

(Emphases added).

166.    On September 20, 2019, defendants Turner, O'Donnell, Jimenez-Tuñon, Lippert and van Sante caused the Company to announce a secondary offering of 18.8 million shares of Pareteum's common stock and 3.8 million units of warrants to purchase Pareteum's stock priced at $40 million, thereby further diluting the Company's stock.

167.    On this news, the Company's shares fell $0.17 per share, or over 9%, to close at $1.67 per share on September 20, 2019, on unusually heavy trading volume.

168.    On October 15, 2019, in a Form 8-K filed with the SEC, Pareteum disclosed that defendant McCarthy had been terminated on October 9, 2019.  As COO of the Company, defendant McCarthy had been responsible for, among other things, maintaining the Company's revenue backlog spreadsheets.  The 8-K stated, in relevant part:

> On October 9, 2019, Denis McCarthy and Pareteum Corporation (the "Company") entered into a settlement agreement and release (the "Separation Agreement") pursuant to which Mr. McCarthy's at-will employment agreement with the Company was terminated and Mr. McCarthy ceased all positions with the Company and its subsidiaries, including as the Company's Chief Operating Officer. Pursuant to the Separation Agreement, Mr. McCarthy will receive a severance payment of $225,000 to be paid in equal monthly installments according to the Company's payroll practices over a period of 12 months from the date of the Separation Agreement and agreed not to trade in the Company's securities through October 1, 2021. Mr. McCarthy will also forego earned and unearned bonuses and vested and unvested stock options will lapse.

169.    On this news, the Company's shares fell $0.36, or over 30%, over three consecutive trading sessions to close at $0.83 per share on October 17, 2019, on unusually heavy trading volume.

**C.      The Truth Fully Emerges**

170.    On October 21, 2019, defendants Turner, O'Donnell, Jimenez-Tuñon, Lippert and van Sante caused Pareteum to file a Form 8-K with the SEC, disclosing that financial statements in the 2018 10-K, 1Q19 10-Q and 2Q19 10-Q should no longer be relied upon and would be restated.  The Form 8-K stated, in relevant part:

> On October 21, 2019, the board of directors of Pareteum Corporation (the "Company") determined that the Company's financial statements which were included in its annual report for the year ended December 31, 2018 and quarterly reports for the quarters ended March 31, 2019 and June 30, 2019 (collectively, the "Non-Reliance Periods") should no longer be relied upon. Similarly, related press releases, earnings releases, and investor communications describing the Company's financial statements for the Non-Reliance Periods should no longer be relied upon.

The Company will restate financial statements for the Non-Reliance Periods in advance of filing the Company's Quarterly Report on Form 10-Q for the three months ended September 30, 2019.

The decision to restate these financial statements is based on the Company's conclusion that certain revenues recognized during 2018 and 2019 should not have been recorded, during that period. For certain customer transactions, the company may have prematurely or inaccurately recognized revenue. These restatements should not impact historical cash or cash equivalents based upon the current review. At the present time, the restatements are expected to impact Revenue, Cost of Service, Operating Income, Net Loss, Accounts Receivable and other Balance Sheet line items. While the Company's analysis is still underway, ***the Company currently estimates the revenue impact for the full year 2018 to be a reduction of approximately $9 million. For the first half of 2019, the Company currently estimates the revenue impact to be a reduction of approximately $24 million.***

At this time, the Company has not fully completed its review and the expected financial impact of the restatement described above is preliminary and subject to change. The Company cannot predict the aggregate amount of revenue that will ultimately be restated, whether additional periods beyond those referenced above will be affected, and the final outcome or timing of the Company's filing of restated financial statements for the affected annual and quarterly periods. ***Until the full magnitude of these transactions is analyzed and understood, the Company cannot provide forward guidance, and we expect the second half and full year 2019 will be materially below current analysts' estimates***.

171.    On this news, the Company's share price fell $0.44, or nearly 60%, to close at $0.30 per share on October 22, 2019, on unusually heavy trading volume.

172.    On November 5, 2019, Pareteum issued a press release stating that defendant Thomas would serve as interim CFO, as defendant O'Donnell's status with the Company was under review.

173.    On November 13, 2019, the Company was informed that it was no longer in compliance with NASDAQ listing rules because it had not timely filed its quarterly report for the period ended September 30, 2019, and would have to regain compliance within 60 days or be listed from the exchange.

174.    On November 25, 2019, the Company issued a press release disclosing that defendant Turner had been terminated as CEO and Executive Chairman on November 22, 2019.

## VII.   DAMAGES TO THE COMPANY

175.    As a direct and proximate result of the Individual Defendants' conduct, Pareteum has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)  the 1,000,000 shares of Company stock issued to Post Road Group on August 22, 2019 and November 15, 2019 arising out of the Company's failure to satisfy its obligations under the Post Road Credit Facility

b)  the September 20, 2019 public offering of 18.8 million shares of Company stock and 3.8 million purchase warrants

c)  Legal fees incurred in connection with the Securities Class Action;

d)  Any funds paid to settle the Securities Class Action;

e)  Costs incurred from compensation and benefits paid to the defendants who have breached their duties to Pareteum; and

f)  Costs incurred in connection with restating its financial statements for the periods ended December 31, 2018; March 31, 2019; and June 30, 2019.

176.    In addition, Pareteum's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

177.    The actions complained of herein have irreparably damaged Pareteum's corporate image and goodwill.  For at least the foreseeable future, Pareteum will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Pareteum's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VIII.   DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

178.    Plaintiff brings this action derivatively in the right and for the benefit of Pareteum to redress injuries suffered, and to be suffered, by Pareteum as a direct result of breaches of fiduciary duty by the Individual Defendants, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.  Pareteum is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

179.    Plaintiff will adequately and fairly represent the interests of Pareteum in enforcing and prosecuting its rights.

180.    Plaintiff has continuously been a shareholder of Pareteum at times relevant to the wrongdoing complained of and is a current Pareteum shareholder.

181.    When this action was filed, Pareteum's Board of Directors consisted of defendants Turner, Jimenez-Tuñon, Lippert, and van Sante and non-party director Mary Beth Vitale. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Defendant Turner**

182.    At all relevant times, Turner was the Company's CEO and Executive Chairman of the Board.  His own statements misleadingly touted Pareteum's 36-month contractual revenue backlog, which was overstated because the Company was unlikely to collect from certain customers, and he was well aware that the Company's public statements did so as well.  Due to his statements, Turner is a defendant in the Securities Class Action.  As a result, Turner would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

**Defendants Jimenez-Tuñon, Lippert, and van Sante**

183.    Defendants Jimenez-Tuñon, Lippert, and van Sante are members of the Company's Audit and Finance Committee.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and the Company's compliance with applicable laws, regulations, and accounting standards.  Defendants Jimenez-Tuñon, Lippert, and van Sante failed to ensure the integrity of the Company's internal controls, allowing the misleading statements to be disseminated in the Company's SEC filings and other disclosures.  Thus, defendants Jimenez-Tuñon, Lippert, and van Sante breached their fiduciary duties and are not disinterested, and demand is excused as to them.

**Defendants Turner, Jimenez-Tuñon, Lippert, and van Sante**

184.    Turner, Jimenez-Tuñon, and van Sante were members of the Board when the Company's misleading proxy statements were issued in 2018 and 2019.  Lippert was a member of the Board when the Company's misleading proxy statement was issued in 2019.  These defendants knew that the proxy statements solicited votes to reelect and compensate directors who were breaching their fiduciary duties. Turner, Jimenez-Tuñon, and van Sante caused the Company to issue the 2019 proxy statement, which failed to disclose that each of the non-employee directors were interested in their own grants of discretionary compensation.  The Board faces a substantial likelihood of liability because they caused the Company to issue misleading proxy statements, and defendants Turner, Jimenez-Tuñon, Lippert, and van Sante would be interested in a demand regarding whether they had discharged their duties as Board members.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty

185.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

186.    Each Individual Defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Pareteum's business and affairs, particularly with respect to issues as fundamental as public disclosures.

187.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Pareteum.

188.    In breach of their fiduciary duties owed to Pareteum, the Individual Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

189.    In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

190.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Pareteum has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

191.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

192.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Pareteum.  The Individual Defendants were

unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Pareteum.

193.    Plaintiff, as a stockholder and representative of Pareteum, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

194.    Plaintiff, on behalf of Pareteum, has no adequate remedy at law.

## COUNT III

### Violations of Section 14 of the Securities Exchange Act of 1934

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.  Specifically, the Company's proxy statement filed on August 3, 2018 violated §14(a) and Rule 14a-9 because it failed to disclose: (i) that the Company was unlikely to collect revenue from certain customer transactions; (ii) that, as a result, Pareteum had improperly recognized revenue derived from these transaction; (iii) that, as a result, Pareteum's revenue backlog and accounts receivable were overstated; (iv) that, as a result, the Company's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (v) that the Company was reasonably likely to restate certain financial statements; (vi) that certain of the Company's officers and directors, including defendants Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with

known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct; (vii) that it misrepresented the Board's actual activities with respect to financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties; and (viii) that each of the non-employee directors was interested in their own grants of discretionary compensation. The Company's proxy statement filed on June 6, 2019 violated §14(a) and Rule 14a-9 because it failed to disclose: (i) that the Company was unlikely to collect revenue from certain customer transactions; (ii) that, as a result, Pareteum had improperly recognized revenue derived from these transaction; (iii) that, as a result, Pareteum's revenue backlog and accounts receivable were overstated; (iv) that, as a result, the Company's 36-month contractual revenue backlog was not indicative of the Pareteum's growth potential; (v) that the Company was reasonably likely to restate certain financial statements; (vi) that certain of the Company's officers and directors, including defendants Turner and O'Donnell, had ties to various failed stock promotions and schemes, as well as to entities associated with known stock manipulator Barry Honig, thereby violating Pareteum's Code of Conduct; and (vii) that it misrepresented the Board's actual activities with respect to financial reporting while soliciting votes to reelect and compensate directors who were breaching their fiduciary duties.

197.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statements were materially false and misleading.

198.    The misrepresentations and omissions in the proxy statements were material to Company shareholders in voting on the proxy statement. The 2018 proxy statement solicited and obtained shareholder votes for: (i) the Artilium acquisition; (ii) director nominees; (iii) the 2018 Incentive Plan; (iv) ratification of the appointment of the Company's independent auditor; (v) executive compensation; (vi) frequency of future advisory votes on executive compensation. The

2019 proxy statement solicited and obtained shareholder votes for: (i) director nominees; and (ii) ratification of the appointment of the Company's independent auditor.  The proxy statements were essential links in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties.

199.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statements.

## COUNT IV

### Against the Director Defendants for Gross Mismanagement

200.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

201.    By their actions alleged herein, the Director Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

202.    As a direct and proximate result of the Director Defendants' gross mismanagement and breaches of fiduciary duty alleged herein, the Company has sustained significant damages in excess of hundreds of millions of dollars.

203.    Because of the misconduct and breaches of duty alleged herein, the Director Defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Pareteum, demands judgment as follows:

A.    Declaring that plaintiff may maintain this action on behalf of Pareteum and that plaintiff is an adequate representative of the Company;

B.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.      Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Pareteum;

D.      Directing Pareteum to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Pareteum and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen Pareteum's oversight of its disclosure procedures;

4.      a provision to control insider transactions; and

5.      a provision to permit the stockholders of Pareteum to nominate at least three candidates for election to the Board;

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Pareteum has an effective remedy;

F.      Awarding to Pareteum restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: February 5, 2020

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@famanlaw.com

**GLANCY PRONGAY & MURRAY LLP**
Matthew M. Houston
Benjamin I. Sachs-Michaels
712 Fifth Avenue
New York, New York 10019
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Robert V. Prongay
Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
E-mail: rprongay@glancylaw.com

*Attorneys for Plaintiff Brad Linton*